In the

# United States Court of Appeals
## For the Seventh Circuit

No. 15-3334

AARON E. ISBY,

*Plaintiff-Appellant,*

*v.*

RICHARD BROWN, *et al.*

*Defendants-Appellees.*

Appeal from the United States District Court for the
Southern District of Indiana, Terre Haute Division.
No. 2:12-cv-116-JMS-MJD — **Jane E. Magnus-Stinson**, *Chief Judge.*

ARGUED FEBRUARY 8, 2017 — DECIDED MAY 10, 2017

Before WOOD, *Chief Judge*, FLAUM, *Circuit Judge*, and
CONLEY, *District Judge*.[*]

FLAUM, *Circuit Judge*. Aaron E. Isby has been held in ad-
ministrative segregation—or, as it is better known, solitary
confinement—for over ten years and counting. He filed suit
against various prison employees under 42 U.S.C. § 1983, al-
leging that his continued placement in administrative segre-
gation violated his Eighth Amendment right to be free from

---

[*] Of the Western District of Wisconsin, sitting by designation.

cruel or unusual punishment as well as his Fourteenth Amendment rights under the Due Process Clause. Isby sought leave to proceed in forma pauperis in the district court, despite having already accumulated three "strikes" for filing frivolous suits or appeals and thus being restricted under the Prison Litigation Reform Act ("PLRA") from seeking pauper status. 28 U.S.C. § 1915(g). Unaware of Isby's strikes, the district court granted Isby's request. The court later granted summary judgment in favor of defendants on the due process claim, and, following a bench trial, entered judgment against Isby on his Eighth Amendment claim.

Still unaware of Isby's three-strikes status, the district court granted him leave to proceed in forma pauperis on appeal. After briefing on appeal was complete, Isby's restricted status came to our and the parties' attention; and two days prior to oral argument, defendants-appellees moved to dismiss this appeal "due to [Isby's] deceptive acts in failing to inform the district court of his numerous 'strikes' under the [PLRA]." For the reasons that follow, we deny the motion to dismiss, affirm the district court with respect to Isby's claim under the Eighth Amendment, and reverse and remand for further proceedings on Isby's due process claim.

## I. Background

### A. Factual Background

In 1989, Isby was convicted of robbery resulting in serious bodily injury and incarcerated at the Pendleton Correctional Facility in Indiana. In October of the following year, a counselor at Pendleton allegedly became verbally abusive. In response, Isby hit him in the face, resulting in officers gassing Isby and entering his cell with dogs, a fire hose, and a fully-

armored cell-extraction team. In the ensuing altercation, one of the dogs was killed, and Isby stabbed two correctional officers—one in the neck, and the other in the head, through a helmet. *See Isby v. Clark*, 100 F.3d 502, 504 (7th Cir. 1996). Isby was subsequently convicted of two counts of attempted murder and battery, and sentenced to an additional forty years in prison.

After his second conviction, Isby was moved among various facilities in Indiana and received several major-conduct reports for Class A or B infractions, including battery (in June 1999) and intimidation (in October 2005). On October 4, 2006, Isby was transferred to the Wabash Valley Correctional Facility. During his first nineteen days at Wabash Valley, he was housed in the general population and was not involved in any infractions, write-ups, or disturbances. On October 23, however, Isby was transferred to department-wide administrative long-term segregation (now called administrative restrictive-status housing) in the Secured Housing Unit ("SHU," now called the "Special Confinement Unit" or "SCU").[1] Isby has remained in the SCU since that time.[2]

---

[1] Indiana Department of Corrections ("IDOC") Policy #01-04-101, "Adult Offender Classification," allows for an offender to be placed in department-wide administrative segregation when that offender has a history of battery on others, presents an extraordinary threat to themselves or others, or presents special safety and security concerns. Section 11-10-1-7 of the Indiana Code similarly provides that an inmate may be involuntarily segregated from the general population if the IDOC "first finds that segregation is necessary for the offender's own physical safety or the physical safety of others." Ind. Code § 11-10-1-7(a).

[2] According to Isby, defendants-appellees neither gave him a hearing prior to placing him in administrative segregation in 2006 nor notified him of his placement by prison mail, and he was placed in the SCU absent any

Isby's cell is approximately eighty square feet, and he remains inside it for twenty-three hours each day. There are windows through which Isby can see the hallway with a skylight, and a hallway clock is also visible from Isby's cell. He has a television and desk and is able to do some exercises such as push-ups in his cell. Isby is limited to one hour per day of out-of-cell exercise in a small outdoor enclosure surrounded by a chain-link fence with a basketball hoop and a pull-up bar. A number of witnesses testified that the outdoor exercise area is frequently covered in bird feces or even dead birds, which the facility refuses to clean. Isby testified that in light of these conditions, including that he is forced to wear a "nylon dog leash" when outside, he sometimes declines the one hour of outside time allotted to him. Another inmate formerly assigned to the SCU testified that the cramped living conditions prevented him from getting sufficient exercise, such that when he was finally released back into the general population, he "sweated profusely" while walking and "almost fainted."

---

emergency condition, charge, prison disturbance, or investigation. As the district court noted, however, with respect to any claim arising from Isby's initial placement in the SCU without notice or a hearing, the two-year statute of limitations applicable to § 1983 actions arising from an alleged injury in Indiana has expired. *See* Ind. Code § 34–11–2–4; *Serino v. Hensley*, 735 F.3d 588, 590 (7th Cir. 2013).

As an aside, from December 29, 2014, to March 29, 2015, Isby was held in disciplinary restrictive-status housing in the SCU. His placement in this even more restrictive form of segregation presumably stemmed from a December 2014 incident described in further detail below, *see infra* n.8; and his time in disciplinary restrictive-status housing is not at issue in this appeal.

Per the district court's findings at trial, Isby also may be outside his cell for social visits, attorney visits, medical appointments, showers, and meetings with prison staff as needed. However, because Isby is housed in the SCU, he does not have access to the vocational, work, or educational programs offered to general-population inmates. Isby is also limited to one personal phone call each week (and legal calls as needed), whereas general-population inmates receive daily telephone access. Isby may communicate with correctional staff when they are on the range (*i.e.*, cell block), as well as with medical and mental-health personnel when they pass out medication and conduct mental-status reviews. He also may communicate orally with other inmates when they are in the recreation area and from cell to cell, though when inmates communicate on the range, other inmates will sometimes disrupt the conversation with radios or by speaking loudly. Isby can send letters to and receive mail from family and friends; but all outgoing legal and personal mail and incoming personal mail is subject to an open-mail rule so that staff can check for contraband and ensure that the sender or recipient matches who is listed on the envelope.[3]

The district court found that cells in the SCU contain security lights that vary between five and nine watts and are on twenty-four hours per day, so that officers can see into the cells when they walk through the ranges. A former inmate testified that the lights in the SCU are brighter than those in

---

[3] This means that Isby's general, non-legal mail is routinely searched and read. Outgoing legal mail is checked to ensure that it is entitled to treatment as legal mail but is not otherwise read, copied, or otherwise interfered with in either sending or receipt.

general population, but defendant Richard Brown, the Superintendent of Wabash Valley, testified that they are the same wattage. Inmates are not able to control the lights, and it is against prison rules to attempt to cover the light, including during nighttime hours. No rule, however, prohibits an inmate from putting a towel, shirt, or other clothing over his eyes when he sleeps. A number of inmates (including Isby) testified that their vision or sleep has been adversely affected by the twenty-four hour lighting, and that they have developed headaches.

The district court found that temperatures in the SCU are maintained within normal limits, although the court noted that, on at least one occasion, temperatures approached forty degrees, and some inmates had to be moved to other housing for their own safety. Various inmates testified that they "freeze" during the winter and "burn … up" in the summer. Regardless of the season, inmates sleep on a thin, vinyl-covered foam mattress laid over a concrete slab, with a light knitted blanket and two sheets. Isby complains that these sleeping arrangements started causing him back problems in 2013. His medical records reflect that his symptoms improved somewhat by July 2014 with osteopathic manipulative treatment.

Isby has eaten all of his meals alone from food trays passed by correctional officers through a narrow port in the cell door. Aramark Food Services contracts with Indiana to provide meals to prison inmates, including those housed in the SCU. Sample Aramark menus introduced during trial reflect that the standard daily caloric intake for an adult male is 2800 calories per day, but the actual number of calories served, averaged over a weekly basis, has never matched or exceeded this

standard.[4] Numerous inmates testified at trial that both the quantity and quality of the food is poor. One SCU inmate also testified that the water in the SCU is rusty, and that if an inmate does not boil the water before consuming it, he will "end up feeling nauseated, sick, diarrhea." Isby is five feet, eleven inches tall, and over the past five years, his weight has fluctuated between 148 and 163 pounds. In September 2010 he weighed 152 pounds, and in April 2015 he weighed 148.[5]

Inmates in the SCU are allowed to shower three times a week (as opposed to daily in the general population), and trial testimony reflected that the water in the showers alternates between "scalding hot" and freezing cold. Inmates also testified that toilets do not flush adequately, in some instances leaving feces, or the odor of feces, present in a cell for multiple days. SCU inmates are provided with a change of clothing once a year and new underwear every six months. The standard-issue clothing for a SCU inmate is a thin red jumpsuit. In winter, inmates are also provided with a "very, very thin" coat, and, if they can afford it, they have the option of purchasing additional warm clothing from the commissary. During trial, a number of inmates testified that when they send clothes to the laundry to be washed, they come back dirty and damaged. Isby said that he hand washes his clothing for that

---

[4] The meals served apparently average approximately 2500 calories, or just under ninety percent of the standard.

[5] Isby takes issue with the district court's focus on only his recent weight fluctuations, but as the defendants-appellees point out in their brief, the court focused on the more recent time period because Isby had submitted into evidence Aramark menus dating back only to September 2010; and any claim accruing before May 15, 2010, would be barred by the two-year statute of limitations.

reason. However, Chris Nicholson, a correctional lieutenant with responsibility over the SCU, testified that clothes generally come back clean, and that there have been maybe three occasions in four years when laundry was returned dirty due to a malfunctioning dryer.

A number of inmates, including Isby himself, testified to feelings of anger, frustration, and helplessness resulting from prolonged and isolated detainment in the SCU. However, Isby is not receiving and has not received treatment for mental illness, and seriously mentally ill inmates are not housed in the SCU. Isby has been seen by mental-health providers at weekly, thirty-day, and ninety-day intervals to determine whether he has any mental-health concerns that would require him to be removed from the SCU. Records of these visits from 2012 to 2014 show that Isby reported no mental-health concerns, though he said things like, "I'm doing the best I can under the circumstances," "I'm okay but I'd be better if they let me out of here," and "How do you think I'm doing," and complained about his time in segregation being excessive. There is no record that Isby ever requested but was refused mental-health treatment.

Inmates in administrative segregation have their placement reviewed every thirty days.[6] The review consists of Wabash Valley staff members examining the offender's Case Plan and other documents related to conduct, history, and

---

[6] Section 11-10-1-7 of the Indiana Code provides that the IDOC "shall review an offender [involuntarily segregated from the general population] at least once every thirty (30) days to determine whether the reason for segregation still exists." Ind. Code § 11-10-1-7(a) and (b).

safety concerns. The IDOC does not require a formal hearing as part of these thirty-day reviews.[7]

In the over-ten-year period that Isby has been assigned to the SCU, IDOC's stated reason for his continued placement following each review has been the same: "Your status has been reviewed and there are no changes recommended to the Southern Regional Director at this time. Your current Department-wide Administrative segregation status shall remain in effect unless otherwise rescinded by the Southern Regional Director." During the 2015 bench trial on Isby's Eighth Amendment claim, Lieutenant Nicholson testified that he had never recommended that Isby be released from the SCU between 2006 and the present time "[b]ecause he killed a … dog and stabbed two officers," referring to the incident that had occurred in 1990. In response to questions from the court, Jerry Snyder, the SCU Unit Team Manager, testified at trial that he had never recommended that Isby be released from the SCU because of the incident in 1990, because Isby had not signed up for two voluntary programs offered by IDOC to recondition inmates housed in the SCU for return to the general population, and because Isby had been "extremely argumentative and disrespectful with staff." The record shows that Isby received a major-conduct report for disorderly conduct in October 2007, but that he had no major disciplinary infractions from early 2009 until December 2014.[8] Snyder testified,

---

[7] *See* IDOC Policy #02-01-111, VII.A ("It shall not be necessary to hold a formal Classification Committee Hearing in order to complete this review.").

[8] In December 2014, Correctional Officer Jaymison Bennett went to Isby's cell to retrieve the phone from Isby when his twenty minutes of allotted phone time was up. Isby became angry because Officer Bennett did

however, that he was aware of incidents during the past few years when Isby has been uncooperative with staff, and that these incidents were not always written up in conduct reports because some officers overlook "minor" infractions by offenders already in long-term restrictive housing.

Offenders in the SCU may also request a more formal review of their placement every ninety days. If such a request is made, a casework manager interviews the inmate and submits a report to the Review Committee and Unit Team Management, who then decide whether or not to keep the inmate segregated from the general population. According to Snyder, documents used in the thirty-day reviews are initially reviewed by the case worker assigned to the inmate, and then by various other individuals up the chain of command, culminating in a review by Snyder himself, and, if release from the SCU is recommended, by the executive director of operations for the IDOC in Indianapolis. The parties dispute the extent to which Isby has requested any such hearing. Defendant Beverly Gilmore, a case worker at Wabash Valley, claimed that Isby requested only two ninety-day reviews, and it is undisputed that full reviews were conducted on or about April 7, 2011, and June 27, 2011, both of which included interviews with Isby and reports considered by the Review Committee.

---

not allow him time to say goodbye. Isby testified that he then placed the phone on the "cuff-port," a small opening in the cell door through which prisoners' hands can be handcuffed. Bennett testified that Isby threw the phone toward the cuff-port of his closed cell door. Video evidence showed that Isby swiped his hand toward the officer through the cuff-port. Bennett then sprayed Isby with pepper spray, and Isby was found guilty of "attempted battery without a weapon." There is no allegation that Isby made any physical contact with the officer, either with the phone handset or his hand.

In contrast, Isby asserted in an October 2013 affidavit that he has requested this more formal review "over [t]en times since December 19, 2009," with his most recent requests for review being submitted in June 2012 and May 2013.

The IDOC also offers self-help programs designed to assist offenders with examining their past behavior and formulating new perspectives. Two of these programs are the Actions, Consequences, and Treatment ("ACT") Program and the Moral Reconation Program. They both include counseling to help inmates learn how to make better decisions. To participate in the ACT Program, the offender must write a request to his caseworker, and the caseworker and Unit Team Manager Snyder choose the participants. The fifth and last phase in the ACT Program involves release from the SCU and transfer to a different unit or facility. The Moral Reconation Program is a twelve-phase cognitive-behavior program, and an offender must likewise make a request in order to participate. These programs offer a means for inmates to potentially earn their way out of the SCU, though in the past, some inmates have also been released from the SCU without having participated in these programs.

Isby believes that the ACT Program is a "mind restructuring program … designed to … indoctrinate certain prisoners and turn them into snitches." Isby has declined to participate in these types of programs. According to defendants-appellees, had Isby expressed interest in participating in either program, he would have been recommended immediately.

The IDOC has also implemented the New Castle Correctional Facility transition program, a step-down program for offenders who have been in restrictive-status housing for several years or longer. The New Castle transition unit has more

programming than that available in the SCU, and the unit is designed to give offenders a greater opportunity for success in adjusting to the general population. The program involves a therapeutic component requiring an inmate to accept responsibility for his own actions.

In August 2014, Snyder advised Isby that Snyder was considering transferring Isby from the SCU to the New Castle transition unit. Snyder explained that prison officials were reviewing all offenders who had been in restrictive-status housing for five or more years, and that officials probably would recommend transfer to New Castle in all of those cases because of the length of time the inmates had been in a restrictive setting. While discussing the program, Isby became adamant that he would not go and that they could not make him go to New Castle. He said there was no reason for him to go to the New Castle transition unit because he did not need to and was not interested, and he demanded to be released to general population at Wabash Valley. Snyder continued to try to talk to Isby, but Isby kept interrupting him. Snyder eventually discontinued the interview, and although several other long-term segregation inmates were recommended for and transferred to New Castle, Isby received no such recommendation or transfer. Snyder said he did not recommend Isby for the program because it requires cooperation. Snyder also expressed concern at the bench trial that if Isby were placed in general population without going through a transition program, his anger issues would present a safety concern for other offenders and prison staff.

## B. Procedural Background

Isby filed this lawsuit in May 2012, and the district court granted his request to proceed in forma pauperis. His second

amended complaint alleged, among other things, that his then six-year (and now ten-year) assignment to the SCU violated the Eighth Amendment's prohibition on cruel and unusual punishment, and that he had not been afforded adequate review of his continued assignment to the SCU, in violation of the Fourteenth Amendment's Due Process Clause.[9]

In September 2013, after the dismissal of two defendants,[10] the remaining defendants moved for summary judgment on the due process claim, arguing that Isby had no right to be free from segregated confinement and that the reviews of his confinement—even in the absence of any in-person hearing— satisfied minimum constitutional guarantees. Defendants also argued that they were entitled to qualified immunity in light of Isby's failure to prove that their conduct violated clearly established law. The district court granted defendants' motion as to the due process claim, concluding that all that was constitutionally required in cases like Isby's were "informal, non-adversarial … periodic review[s]" at a frequency "committed to the discretion of prison officials" and sufficient

---

[9] The operative complaint named as defendants Richard Brown (Superintendent at Wabash Valley), Bruce Lemmon (Commissioner of IDOC), James Wynn (Director of Classification for IDOC), Stanley Knight (Interim Deputy Commissioner for IDOC), Jack Hendrix (Assistant Superintendent at Wabash Valley), Jerry Snyder (SCU Unit Team Manager at Wabash Valley), Beverly Gilmore (Casework Manager at Wabash Valley), Julie Snider (Counselor at Wabash Valley), and Dusty Russell (Custody Supervisor at Wabash Valley).

[10] In June 2013, defendants Knight and Lemmon moved to dismiss, arguing that sovereign immunity barred Isby's action against them and that neither of them was personally involved in the alleged deprivations of Isby's constitutional rights. Isby did not oppose this motion, and in July 2013, the district court dismissed Knight and Lemmon.

to ensure that segregation does not become a "pretext for indefinite confinement." The court found that although the parties disputed whether Isby had requested any formal ninety-day reviews since 2011, summary judgment was nonetheless appropriate because it was undisputed that Isby had received ongoing thirty-day reviews of his placement, and Isby had not cited to any authority requiring those reviews to be anything more than "informal and non-adversarial."

In July 2015, the district court held a two-day bench trial on Isby's Eighth Amendment claim.[11] Two months later, the district court entered judgment in defendants' favor. The district court found that the food, clothing, lighting, laundry, and opportunities for exercise, showers, and time outside provided to Isby in the SCU passed constitutional muster. The court noted that Isby's weight over the past five years had not fluctuated greatly, nor was there evidence of any severe health problem; the district court also explained that any Eighth Amendment concern implicated by twenty-four hour lighting in the SCU was negated by the fact that Isby can cover his eyes with clothes or towels. The court credited Isby's testimony that he feels "dehumanized" by his conditions of confinement but found it significant that Isby has not taken "advantage of any of the opportunities to speak with mental health practitioners, engage in counseling, or otherwise discuss or attempt to diffuse these difficult circumstances."

---

[11] After Isby presented his case during the bench trial, defendants Wynn, Beverly, Gilmore, Snider, Hendrix, and Russell moved for judgment as a matter of law in their favor. The district court granted that motion as to Wynn, Snider, and Russell, leaving Brown, Hendrix, Snyder, and Gilmore as the remaining defendants below.

The district court noted that although it was "*greatly disturbed*" by the length of time Isby has spent in administrative segregation, his continued placement is "a result of his own refusal to cooperate in any way with prison officials in efforts to transition him into the general housing population." The court recognized that Isby "cannot be punished forever for killing a canine and attacking prison officers in 1990," but nonetheless determined that the prison's insistence that Isby participate in a prison-mandated transition program was "not unreasonable." Because "no case under similar circumstances where duration alone, coupled with a prisoner's refusal to participate in correctional programming, supported a finding of a constitutional violation," the district court found no violation of Isby's Eighth Amendment rights.

On appeal, Isby again sought and was granted leave to proceed in forma pauperis. On February 3, 2017, after briefing was completed and only five days before oral argument, another panel of this Court dismissed a separate appeal by Isby in a different case, in which Isby had contended that prison officials burdened his religious exercise by failing to serve him kosher food. *See Isby-Israel v. Lemmon*, No. 16-2697, 2017 WL 465670 (7th Cir. Feb. 3, 2017). The panel in *Isby-Israel* observed that Isby "knew [from the dismissal of one of his earlier actions] that he had already accumulated three 'strikes' for filing frivolous suits or appeals," and that he thus had to pay the full filing fee upfront. *See id.* at *1. The *Isby-Israel* panel concluded that Isby's withholding of his three-strikes status was deceptive and dismissed that appeal, ordering him to pay all fees in this Court and in the district court and directing the clerks of federal courts in this Circuit to return as unfiled any papers submitted by him or on his behalf until full payment had been made. *Id.* at *2.

Three days later, defendants-appellees moved to dismiss this appeal, contending that "[t]he facts and circumstances in this appeal are nearly identical [to those of *Isby-Israel*]"; noting several other occasions on which Isby had been told by federal judges that he had "struck out"; and characterizing Isby as having deceived the district court. We took their motion with the case for resolution following oral argument.

## II. Discussion

### A. Motion to Dismiss the Appeal

We first consider whether to dismiss this appeal based on Isby's failure to alert the court to his three strikes and to pay the requisite filing fees. Under the PLRA, prisoners who have accrued three "strikes" from filing actions or appeals dismissed as frivolous are barred from bringing another action in federal court without prepayment of fees. *See* 28 U.S.C. § 1915(g). The law of our Circuit requires such litigants to disclose to the court the fact that they have "struck out" and to pay all fees upfront, or risk dismissal of their case as a sanction for misconduct. *See, e.g.*, *Gay v. Chandra*, 682 F.3d 590, 595–96 (7th Cir. 2012); *Hoskins v. Dart*, 633 F.3d 541, 543 (7th Cir. 2011); *Ammons v. Gerlinger*, 547 F.3d 724, 725 (7th Cir. 2008).

Isby does not dispute that he was aware of his three strikes when he initially brought this action in district court and when he appealed. Nor could he credibly do so, given the many other cases he has brought that were dismissed explicitly on the basis of his litigation history. *See, e.g.*, *Isby v. Bennet*, No. 2:16-cv-00351-LJM-MJD, 2016 WL 5851603 (S.D. Ind. Oct. 6, 2016) (denying motion to alter or amend judgment dismissing Isby's case sua sponte when he sought leave to proceed in

forma pauperis without acknowledging his three strikes); *Israel v. Brown*, No. 14-2168 (7th Cir. Aug. 15, 2014) (order denying motion for leave to proceed on appeal in forma pauperis because "Isby-Israel has accumulated three strikes"); *Israel v. Donahue*, No. 3:06-cv-0809 WL, 2006 WL 3833390 (N.D. Ind. Dec. 13, 2006) (noting that Isby had accumulated nine strikes and, pursuant to § 1915(g), could not proceed in forma pauperis); *Israel v. Miller*, No. 3:05-CV-300 RM, 2005 WL 1310535 (N.D. Ind. May 31, 2005) (same); *cf. Israel v. Brown*, 135 S. Ct. 2864 (2015) ("As petitioner has repeatedly abused this Court's process, the Clerk is directed not to accept any further petitions in noncriminal matters from petitioner unless the docketing fee … is paid …."). He likewise does not dispute that he failed to alert the district court of his three strikes. The issue came to light, mere days before oral argument, only when another panel of this Court dismissed Isby's appeal in a different case, *see Isby-Israel*, 2017 WL 465670, and defendants-appellees in this case followed up with their motion to dismiss.

Defendants-appellees argue that we ought to dismiss Isby's appeal because he concealed his restricted status from the district court when he sought pauper status below and on appeal. *See Sloan v. Lesza*, 181 F.3d 857, 859 (7th Cir. 1999) ("An effort to bamboozle the court by seeking permission to proceed *in forma pauperis* after a federal judge has held that § 1915(g) applies to a particular litigant will lead to immediate termination of the suit."). While there is an exception to § 1915(g) for prisoners who are "under imminent danger of serious physical injury," 28 U.S.C. § 1915(g), Isby conceded in his response to defendants-appellees' motion to dismiss and at oral argument that he had not pled any such danger. Instead, Isby requests that we exercise our discretion under Fed-

eral Rule of Appellate Procedure 3(a)(2) and examine the merits of his claims, given the serious constitutional questions at issue and the late stage at which defendants-appellees raised their § 1915(g) argument.

We note that defendants-appellees do not argue that § 1915(g) imposes a jurisdictional bar to our hearing Isby's appeal; they simply observe that we may sua sponte raise § 1915(g) as a basis for dismissal. By its terms, § 1915(g) does not preclude a prisoner from bringing suit in federal court entirely; rather, the prisoner may either prepay in full all filing fees or make a showing of imminent danger of serious physical injury in order to proceed with a federal suit. *See, e.g., Abdul-Akbar v. McKelvie*, 239 F.3d 307, 314 (3d Cir. 2001) ("It is important to note that § 1915(g) does not block a prisoner's access to the federal courts. It only denies the prisoner the privilege of filing before he has acquired the necessary filing fee."). We have never referred to the three-strikes provision as a jurisdictional bar, instead treating it as one of the many procedural constraints imposed by the PLRA. *See United States v. Antonelli*, 371 F.3d 360, 361 (7th Cir. 2004) (referring to three-strikes provision as one of several procedural constraints under the PLRA); *cf. Kaba v. Stepp*, 458 F.3d 678, 684 (7th Cir. 2006) (explaining that the PLRA "exhaustion requirement is not jurisdictional") (citation omitted). To avoid any ambiguity, we now explicitly join our sister circuits in holding that the requirements of the PLRA's three-strikes provision are procedural, and not jurisdictional, in nature. *See Lisenby v. Lear*, 674 F.3d 259, 263 (4th Cir. 2012); *Lloyd v. Benton*, 686 F.3d 1225, 1227–28 (11th Cir. 2012); *Dubuc v. Johnson*, 314 F.3d 1205, 1210 (10th Cir. 2003) ("[section] 1915(g)'s provisions are not jurisdictional in nature but contain a condition precedent which prevents a review of the merits of a three-strikes prisoner-

plaintiff's claims, except under extraordinary circumstances, until the prisoner has prepaid the applicable fees").

As Isby's three strikes do not bar us from hearing his appeal, we may consider whether to exercise our discretion to reach the merits of Isby's case. *See* Fed. R. App. P. 3(a)(2) ("An appellant's failure to take any step other than the timely filing of a notice of appeal does not affect the validity of the appeal, but is ground only for the court of appeals to act as it considers appropriate, including dismissing the appeal."); *cf. Arobelidze v. Holder*, 653 F.3d 513, 517 (7th Cir. 2011) ("Because the rule [requiring immigration petitioners to exhaust all administrative remedies before seeking judicial review] is non-jurisdictional, it is subject to waiver, forfeiture, and other discretionary considerations."). Isby points us to *Garcia v. Silbert*, in which the Tenth Circuit elected to reach the merits of a plaintiff-prisoner's case, notwithstanding the fact that § 1915(g) applied and he had not alleged imminent harm, so long as the plaintiff paid in full the filing fees owed to the court. *See* 141 F.3d 1415, 1417 n.1 (10th Cir. 1998); *see also Smith v. Veterans Admin.*, 636 F.3d 1306, 1309–10 (10th Cir. 2011) ("we have long recognized that we retain discretion to ignore the three-strikes rule and reach the merits of an appeal") (citation omitted). Isby encourages us to adopt the same approach in the case at hand, and his appointed counsel has offered to pay all of the fees due in this action, citing to the Illinois Rules of Professional Responsibility. *See* Ill. R. Prof. Responsibility 1.8(e)(2) (allowing lawyers to pay court costs and litigation expenses on behalf of an indigent client); *see also* Ind. R. Prof. Conduct 1.8(e)(2) (same). Defendants-appellees distinguish *Garcia*, however, emphasizing that the prisoner in that case had never been told by a federal judge that he had struck out, nor had the Tenth Circuit held that prisoners to whom

§ 1915(g) applies have a duty to alert the court to their three-strikes status. Defendants-appellees cite to *Sloan*, in which we declined to provide the prisoner who had struck out an opportunity to pay docketing and filing fees because he had "committed a fraud on the federal judiciary." 181 F.3d at 859; *see also id.* ("A litigant who follows frivolous litigation with fraud has no claim to a tender reception.").

Isby's deception by omission is certainly not lost on us, and we agree with defendants-appellees that Isby's counsel's payment of all fees owed to this Court and the district court does not remedy his fraud. However, we have recognized the possibility of a lawyer paying for a prisoner's filing fee as a viable option under § 1915(g)—albeit in the context of borrowing the fee from one's attorney with the promise of reimbursement under 42 U.S.C. § 1988. *See Lewis v. Sullivan*, 279 F.3d 526, 530 (7th Cir. 2002). And we agree with Isby that the length of his placement in administrative segregation implicates serious constitutional concerns. Given the foregoing, and the fact that defendants-appellees raised the § 1915(g) issue only two days before oral argument, we deny the motion to dismiss, exercise our discretion to consider the merits of Isby's claims, and will accept Isby's counsel's payment of his fees. That said, we caution future litigants to whom § 1915(g) applies that our course of action in this case is the exception, not the norm, and our holdings in *Sloan*, *Ammons*, and so forth remain intact. Restricted filers must still alert the court to their three-strikes status or risk dismissal and termination of their suits "not only for lack of payment but also as a sanction for misconduct." *Ammons*, 547 F.3d at 725 (citation omitted).

### B. Eighth Amendment Claim

We now turn to Isby's appeal from the district court's verdict on his Eighth Amendment claim. We review the court's legal conclusions de novo and its factual findings for clear error, *see, e.g.*, *Ernst v. City of Chi.*, 837 F.3d 788, 795–96 (7th Cir. 2016) (citation omitted), and certain mixed questions of law and fact concerning constitutional issues may be reviewed de novo, *see Dean Foods Co. v. Brancel*, 187 F.3d 609, 616–17 (7th Cir. 1999) (citation omitted).

In cases involving the conditions of confinement in a prison, two elements are required to establish a violation of the Eighth Amendment's prohibition against cruel and unusual punishment: first, an objective showing that the conditions are sufficiently serious—*i.e.*, that they deny the inmate "the minimal civilized measure of life's necessities," *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981), creating an excessive risk to the inmate's health and safety—and second, a subjective showing of a defendant's culpable state of mind. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). We have held that "prolonged confinement in administrative segregation may constitute a violation of the Eighth Amendment … depending on the duration and nature of the segregation and whether there were feasible alternatives to that confinement." *Rice ex rel. Rice v. Corr. Med. Servs.*, 675 F.3d 650, 666 (7th Cir. 2012) (citing *Walker v. Shansky*, 28 F.3d 666, 673 (7th Cir. 1994)); *see also Meriwether v. Faulkner*, 821 F.2d 408, 416 (7th Cir. 1987).

We agree with the district court that Isby's Eighth Amendment claim fails on the objective element. Isby raises a number of complaints about the SCU relating to the lighting, food, temperatures, sleeping arrangements, the restricted time for showers and exercise, and so forth. He claims that the district

court erred by analyzing each of these conditions in isolation, rather than in totality. However, the court's order made clear: "Even having considered the total effect of Mr. Isby[]'s circumstances, … they do not rise to the level of extreme deprivation of basic human needs required to satisfy Eighth Amendment standards." Given our extensive case law rejecting Eighth Amendment claims based on similar conditions of confinement, we cannot say that the district court's conclusion on this matter constituted error. *See, e.g.*, *Davenport v. DeRobertis*, 844 F.2d 1310, 1315 (7th Cir. 1988) (observing that at least five hours per week of exercise outside cell may be necessary to avoid constitutional issues); *Vasquez v. Frank*, 290 F. App'x 927, 929 (7th Cir. 2008) ("24-hour lighting involving a single, 9-watt fluorescent bulb does not objectively constitute an extreme deprivation") (citation and internal quotation marks omitted);[12] *Williams v. Berge*, 102 F. App'x 506, 507 (7th Cir. 2004) ("Prisoners have a right to adequate food, but not to food that is tasty or even appetizing.") (citing, *inter alia*, *Lunsford v. Bennett*, 17 F.3d 1574, 1578 (7th Cir. 1994)); *Bono v. Saxbe*, 620 F.2d 609, 613–14 (7th Cir. 1980) ("[T]he segregated area was not overcrowded or unsanitary. Inmates had some reading materials and an opportunity to exercise. 'Seconds' at meals were not available and food was occasionally cold, but

---

[12] Isby cites to *Keenan v. Hall*, 83 F.3d 1083 (9th Cir. 1996), in which the Ninth Circuit held that summary judgment was inappropriate where an inmate alleged that large fluorescent lights kept his cell constantly illuminated and caused sleeping issues and other mental and psychological problems. *See id.* at 1090–91. Here, however, the district court weighed all available evidence at trial and found that Isby was allowed to cover his eyes with clothes or towels if the light disturbed him. And, as defendants point out, the lights in *Keenan* involved "large fluorescent lights," not five-to-nine-watt bulbs.

it was the same food as that served to the general prison population…. Inactivity, lack of companionship and a low level of intellectual stimulation do not constitute cruel and unusual punishment even if they continue for an indefinite period of time ….”); *Meriwether*, 821 F.2d at 415 (“[C]onditions are not unconstitutional simply because they are harsh and restrictive; such conditions are part of the penalty that criminal offenders pay for their offenses against society…. [T]he Constitution does not mandate that prisons be comfortable ….”) (internal citation and quotation marks omitted); *see also Hosna v. Groose,* 80 F.3d 298, 306 (8th Cir. 1996) (no violation for weekly outdoor recreation in prison yard totaling three hours); *cf. Hardaway v. Meyerhoff*, 734 F.3d 740, 744–45 (7th Cir. 2013) (no atypical and significant hardship violating the Fourteenth Amendment's Due Process Clause where access to showers was only weekly).

Moreover, although Isby points out that “[s]*ome* conditions of confinement may establish an Eighth Amendment violation in combination when each would not do so alone,” this occurs “only when they have a mutually enforcing effect that produces the deprivation of a single, identifiable human need such as food, warmth, or exercise.” *Wilson v. Seiter*, 501 U.S. 294, 304 (1991) (providing example of low cell temperature at night combined with failure to issue blankets) (citations and internal quotation marks omitted). While “the length of confinement cannot be ignored in deciding whether the confinement meets constitutional standards,” *Hutto v. Finney*, 437 U.S. 678, 686 (1978), we agree with the district court that there is no evidence of serious physical, mental, or psychological harm to Isby caused by the conditions of the SCU

or the duration of Isby's segregation.[13] It's true that Isby testified to feeling angry and dehumanized in isolation, but he generally stated that he was "alright" and declined opportunities to speak with mental-health practitioners, engage in counseling, or otherwise discuss or attempt to alleviate these circumstances. *See Pearson v. Ramos*, 237 F.3d 881, 886 (7th Cir. 2001) ("It is telling that no credible evidence was presented of any physical or psychological harm to the plaintiff as a result of his protracted confinement in the segregation unit …."). Without some egregious deprivation, *see, e.g.*, *Walker*, 28 F.3d at 672–73 (possible Eighth Amendment violation stemming from prolonged segregation while being denied water for periods of up to one week, given inadequate time to exercise, and subjected to physical abuse), Isby's complaints about the conditions of his confinement fall short.

Moreover, "[o]bviously influencing whether prolonged segregation constitutes cruel and unusual punishment is the existence of feasible alternatives." *Meriwether*, 821 F.2d at 417. As the district court noted, "[t]his [case] presents a somewhat unique circumstance where feasible alternatives—the New Castle transition program, the ACT program—do exist, but they are alternatives that reasonably require Mr. Isby[] to co-operate, and he has steadfastly refused to do so." Isby takes issue with what he characterizes as the district court's overreliance on the existence of these IDOC programs in denying his Eighth Amendment claim. He notes that the district court cited nothing in support of its assertion that an Eighth Amendment violation may be nullified because the inmate

---

[13] *But see Kervin v. Barnes*, 787 F.3d 833, 837 (7th Cir. 2015) ("The serious psychological consequences of … quasi-solitary imprisonment have been documented.") (collecting sources).

could take steps to reduce the harms being inflicted. However, numerous cases support this very proposition. *See, e.g.*, *Freeman v. Berge*, 441 F.3d 543, 547 (7th Cir. 2006) (no Eighth Amendment violation where "to an overwhelming degree Freeman's food deprivation was self-inflicted [because he refused to wear pants while eating], … and the record contains no evidence that he experienced real suffering … or any lasting detrimental health consequences"); *Rodriguez v. Briley*, 403 F.3d 952, 952–53 (7th Cir. 2005) ("deliberate noncompliance with a valid rule does not convert the consequences that flow automatically from that noncompliance into punishment…. As soon as Rodriguez puts his belongings in the storage box, he can leave his cell and go to the cafeteria…. [B]y failing to comply with a reasonable condition … , and as a result missing out on meals, Rodriguez punished himself."); *Sostre v. McGinnis*, 442 F.2d 178, 187, 193–94 (2d Cir. 1971) (no Eighth Amendment violation where officials testified that prisoner could have returned to the general population "either by successful participation in group therapy or by agreeing to live by the rules of the prison"), *overruling on other grounds recognized by, e.g., Davidson v. Scully*, 114 F.3d 12 (2d Cir. 1997).[14]

---

[14] It is true that there is no guarantee that participating in the IDOC self-help programs would necessarily lead to Isby's return to the general population (unlike compliance with the prison rules at issue in *Rodriguez* or *Freeman*, or the explicit testimony by prison officials in *Sostre*), or that program participation is a necessary predicate to being released from administrative segregation. And there was some dispute as to the extent to which Isby was aware of the degree to which an IDOC program was a necessary predicate to his being released from the SCU. Regardless, the district court's factual assessments of these programs do not strike us as clear error, and, given the lack of evidence of egregious conditions in the

While, as a personal matter, we (like the district court) find the length of Isby's confinement greatly disturbing, *see, e.g., Davis v. Ayala*, 135 S. Ct. 2187, 2208–10 (Kennedy, J., concurring) (discussing "[t]he human toll wrought by extended terms of isolation"), *reh'g denied*, 136 S. Ct. 14 (2015), we agree that under the law as it currently stands, Isby has not made out an Eighth Amendment violation.

### C. Fourteenth Amendment Claim

We review the district court's grant of summary judgment on Isby's due process claim de novo, construing all facts and drawing all reasonable inferences in Isby's favor. *See, e.g., Collins v. Al-Shami*, 851 F.3d 727, 730–31 (7th Cir. 2017) (citation omitted). Summary judgment is appropriate if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a).

The Due Process Clause of the Fourteenth Amendment applies only to deprivations of life, liberty, and property. "Otherwise states are free to act summarily." *Marion v. Radtke*, 641 F.3d 874, 875 (7th Cir. 2011) (per curiam). "We undertake a two-part analysis in procedural due-process cases: first, we determine whether the plaintiff was deprived of a protected interest; if so, we determine what process was due under the circumstances." *Hess v. Bd. of Trs. of S. Ill. Univ.*, 839 F.3d 668, 673 (7th Cir. 2016) (citations omitted). Prisoners do not have a constitutional right to remain in the general population, *see, e.g., Sandin v. Conner*, 515 U.S. 472, 480 (1995) ("transfer to less amenable quarters for nonpunitive reasons [is] 'ordinarily

---

SCU or serious suffering on Isby's part, we affirm the court's verdict on Isby's Eighth Amendment claim.

contemplated by a prison sentence'" (quoting *Hewitt v. Helms*, 459 U.S. 460, 468 (1983))); but "both the duration *and* the conditions of the segregation must be considered" in determining whether due process is implicated, *Marion v. Columbia Corr. Inst.*, 559 F.3d 693, 698 (7th Cir. 2009) (citation omitted).

The district court concluded that, "[g]iven the length of time Isby[] has been confined in administrative segregation, … and accepting [his] undisputed sworn statements concerning the conditions of his confinement as true for purposes of the summary judgment motion, … a due process liberty is at stake." Defendants-appellees sensibly do not contest the conclusion that the extraordinary length of Isby's segregation in the SCU implicates his due process rights. *See, e.g., Harris v. Caruso*, 465 F. App'x 481, 484 (6th Cir. 2012) ("Harris has a cognizable liberty interest due to the atypical [eight-year] duration of his administrative segregation"). They claim, however, that the reviews that Isby receives every thirty days are sufficient for due process.

The Supreme Court held in *Hewitt* that the Due Process Clause mandates that prison officials periodically review whether an inmate placed in administrative segregation continues to pose a threat. 459 U.S. at 477 n.9, *abrogated in part on other grounds by Sandin*, 515 U.S. 472. The Court recognized that "lawfully incarcerated persons retain only a narrow range of protected liberty interests," and that "broad discretionary authority is necessary because the administration of a prison is at best an extraordinarily difficult undertaking." *Id.* at 467 (citation and internal quotation marks omitted). The Court then concluded that since "a prison's internal security is … a matter normally left to the discretion of prison administrators," *id.* at 474 (citation omitted), elaborate procedural

safeguards like an adversary proceeding were unnecessary, *id.* at 474–75. Thus, although "administrative segregation may not be used as a pretext for indefinite confinement of an inmate," the periodic review of the confinement of such inmates required to meet due process "will not necessarily require that prison officials permit the submission of any additional evidence or statements." *Id.* at 477 n.9. Rather:

> The decision whether a prisoner remains a security risk will be based on facts relating to a particular prisoner—which will have been ascertained when determining [whether] to confine the inmate to administrative segregation—and on the officials' general knowledge of prison conditions and tensions, which are singularly unsuited for "proof" in any highly structured manner…. [T]he ongoing task of operating the institution will require the prison officials to consider a wide range of administrative considerations.

*Id.* As the district court here rightly explained, we and other circuits have interpreted *Hewitt* as entitling inmates to an "informal and nonadversary" periodic review (the frequency of which is committed to the discretion of the prison officials) that keeps administrative segregation from becoming a pretext for indefinite confinement. *Westefer v. Neal*, 682 F.3d 679, 684–86 (7th Cir. 2012) (dealing with transfers to supermax prison, where inmates were held in either disciplinary or administrative segregation) (citations omitted); *see also Smith v. Shettle*, 946 F.2d 1250, 1254 (7th Cir. 1991); *Black v. Parke*, 4 F.3d 442, 448 (6th Cir. 1993) ("inmates in segregation are entitled

only to minimal procedural process, so long as that process is not pretextual").

Isby takes issue with the perfunctory nature of his thirty-day reviews, emphasizing that, despite the amount of time that has passed since the 1990 incident,[15] the duration of his confinement in the SCU, and his long stretches without disciplinary charges, he receives the same two-line decision at every review. To evaluate Wabash Valley's procedures in light of *Hewitt*, we consider the three *Mathews v. Eldridge* factors: (1) the private interest (that is, Isby's interest) affected by a governmental decision, (2) the governmental interests at stake, and (3) "the risk of an erroneous deprivation of [the private] interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards." 424 U.S. 319, 335.

With respect to the first factor, Isby's private interest is considerably lessened because of his status as an inmate. *See, e.g.*, *Hewitt*, 459 U.S. at 473 ("[The prisoner] was merely transferred from one extremely restricted environment to an even more confined situation"). However, whereas the inmate in *Hewitt* spent less than two months in segregation awaiting a hearing, Isby has spent over ten years there, and counting. The extended, indefinite length of his placement in the SCU tips the scale in his favor on this prong of the analysis. *See*

---

[15] Defendants-appellees claim that the trial transcript does not support Isby's assertion that the 1990 incident is the sole reason for his placement in the SCU. But Lieutenant Nicholson did testify that he never recommended Isby for release from the SCU "[b]ecause he killed a … dog and stabbed two officers." Nicholson also testified, however, that he was not the sole decisionmaker, and Isby himself stated that he was eventually told that he was in the SCU because of his "conduct history" generally.

*Proctor v. LeClaire*, 846 F.3d 597, 610 (2d Cir. 2017) ("Proctor's interest in avoiding an indefinite Ad Seg term is surely substantial, more so than [the inmate in *Hewitt*'s] interest in avoiding a temporary Ad Seg term awaiting a hearing."); *Mims v. Shapp*, 744 F.2d 946, 951–52 (3d Cir. 1984) (concluding that inmate facing "potentially limitless" term in administrative segregation has "a more significant liberty interest for due process analysis than that attributed to the prisoner in *Hewitt*").

Next, we consider the government's interests, which are substantial. Maintaining institutional security and safety are crucial considerations in the management of a prison, and, to the extent that an inmate continues to pose a threat to himself or others, ongoing segregation may well be justified. *See, e.g.*, *Bell v. Wolfish*, 441 U.S. 520, 547 (1979) ("Prison officials must be free to take appropriate action to ensure the safety of inmates and corrections personnel and to prevent escape or unauthorized entry."). Obviously, however, the validity of the government interest continues only so long as the inmate continues to pose a safety or security risk. *Mims*, 744 F.2d at 953; *see also id.* ("the governmental interest involved in a good faith decision to subject a prisoner to administrative segregation may fluctuate with the passage of time and change of circumstances"). It is for this very reason that the *Hewitt* Court determined that periodic review of administrative segregation decisions is necessary. *See id.* at 953–54; *see also Smith*, 946 F.2d at 1254–55 ("[inmate's period of administrative segregation, which was not fixed in advance,] is an indefinite term, keyed to changing conditions, so there has to be some mechanism

for determining whether change has occurred").[16] And again, whereas the inmate in *Hewitt* was confined to administrative segregation pending the completion of investigations into his role in a prison riot and a hearing on charges against him, the record here indicates that Isby has been held indefinitely following the 1990 incident and other past behavioral issues.[17] With no potential end date on Isby's segregation, we confront the third of the *Mathews* factors and note that the boilerplate output of each review seems all the more concerning.

Defendants-appellees claim that "[t]here is no mystery as to why Isby remains in the SCU," and the undisputed-facts portion of the district court's summary judgment order states that Isby has been kept in segregation because of his extensive

---

[16] Defendants-appellees argue that *Smith* held that the thirty-day review process at issue in this case passed constitutional muster. But what we held in *Smith* was that the prison officials' uncontroverted affidavits established that the inmates received notice and an opportunity to be heard on the front end as well as sufficiently frequent periodic reviews. *See* 946 F.2d at 1254. The adequacy or potential pretextual nature of those periodic reviews was thus not at issue in that case.

[17] In response to a question from the district court during the bench trial, defendant Jerry Snyder, the Unit Team Manager for the SCU at Wabash Valley, confirmed that he did not recall any conduct by Isby that prompted his move from the general population to the SCU. And even accepting the district court's findings of fact on this issue and the trial testimony that Isby was "extremely argumentative and disrespectful," our own case law warns that long stretches of solitary confinement may be too strict of a punishment for mere behavioral problems. *See Kervin*, 787 F.3d at 837 (reminding prison officials and judges "to be alert for the potentially serious adverse consequences of protracted segregation as punishment for misbehavior in prison, especially … nonviolent misbehavior" like repeatedly talking back to prison guards).

conduct-report history, past behavior, violent tendencies, inability to cooperate with Wabash Valley staff, and other factors. However, the first two items in this list are limited to occurrences in the past, and it is unclear whether the other three items occurred in the distant or recent past as opposed to currently affecting Isby's readiness to return to the general prison population. Meanwhile, Lieutenant Nicholson highlighted the 1990 incident as the main reason for Isby's continued placement in segregation. If it is in fact the case, as defendants-appellees suggest, that Isby is still being held in administrative segregation because of his *ongoing* refusal to cooperate with staff and to participate in any of the self-help programs, then it seems easy enough to include that explanation in the output of his thirty-day reviews. *See Toevs v. Reid*, 685 F.3d 903, 913–14 (10th Cir. 2012) ("if the relevant circumstances truly have not changed, that can easily be stated, rather than just relying on a meaningless, repetitive, and rote response") (citation omitted). Even one or two edits or additions along these lines could assuage our concerns and provide helpful notice to Isby as to the reasons for his placement and how he could get out. While defendants-appellees claim that Isby is "well aware that he has an avenue for release" through the self-help programs, it is uncertain that participation in the IDOC programs would necessarily result in transfer or release from the SCU, and the parties dispute the extent to which such information was communicated to Isby.[18]

---

[18] The district court's bench-trial order on Isby's Eighth Amendment claim concluded that Isby had "avenues that he *could* take to lead him to general population" (emphasis added), which "he simply has chosen not to attempt." But these conclusions do not necessarily bear on Isby's due process claim (*i.e.*, as to whether the existing process was sufficient).

Defendants-appellees emphasize that the law does not require that an inmate receive a statement of reasons for their retention in administrative segregation. *See Westefer*, 682 F.3d at 685–86. While such a statement of reasons may not be constitutionally required, however, under *Hewitt*, the periodic review must still be meaningful and non-pretextual. *Westefer*, 682 F.3d at 686 (citing *Hewitt*, 459 U.S. at 477 n.9); *see also Toevs*, 685 F.3d at 912 ("The [periodic] review need not be extensive, … [b]ut the review must be meaningful; it cannot be a sham or a pretext.") (citations omitted); *Mims*, 744 F.2d at 954 (warning that periodic reviews must "not become simply a sham"). The Third Circuit has held that "a meaningful review … is one that evaluates the prisoner's current circumstances and future prospects, and, considering the reason(s) for his confinement to the program, determines whether that placement remains warranted." *Toevs*, 685 F.3d at 913 (internal quotation marks omitted).[19] On the record at summary judgment, there is a genuine dispute of fact as to whether the thirty-day reviews

---

[19] The Third Circuit also elaborated that "[w]here … the goal of the placement is solely and exclusively to encourage a prisoner to improve his future behavior, the review should provide a statement of reasons, which will often serve as a guide for future behavior (i.e., by giving the prisoner some idea of how he might progress toward a more favorable placement)." *Toevs*, 685 F.3d at 913; *cf. Wilkinson v. Austin*, 545 U.S. 209 (2005) (noting that Ohio's requirement that a decisionmaker provide a "short statement of reasons … guards against arbitrary decisionmaking while also … serv[ing] as a guide for future behavior") (citation omitted). The defendants-appellees argue that even if they did not provide official notice or statements of reasons, Isby was aware that he needed to improve his behavior and participate in the IDOC self-help programs in order to be eligible for transfer. However, Isby argues that there was no guarantee that participation would lead to such a transfer and that others were moved out of the SCU without participation, which raises issues of fact.

take into account any updated circumstances in evaluating the need for continued confinement, given the length of Isby's segregation, his long stretches of time without any disciplinary issues, and the rote repetition of the same two boilerplate sentences following each review. And while submission of new evidence or a full hearing may not be *necessary* to meet the requirements of due process under *Hewitt*, an actual review—*i.e.*, one open to the possibility of a different outcome—certainly is. *See, e.g.*, *Proctor*, 846 F.3d at 611 ("It is inherent in *Hewitt*'s use of the term 'periodic' that ongoing Ad Seg reviews may not be frozen in time, forever rehashing information addressed at the inmate's initial Ad Seg determination…. prison officials must look to the inmate's present and future behavior and consider new events to some degree to ensure that prison officials do not use past events alone to justify indefinite confinement.").

Several other circuits have also criticized review procedures like those we have here. *See, e.g.*, *Incumaa v. Stirling*, 791 F.3d 517, 534 (4th Cir. 2015) ("The ICC has merely rubber-stamped Appellant's incarceration in [solitary confinement] (figuratively and sometimes literally), listing in rote repetition the same justification every 30 days…. Indeed, the ICC's ongoing classification of Appellant is especially wanting for explanation in light of his nearly perfect disciplinary record while in security detention.") (citations and internal quotations omitted); *Selby v. Caruso*, 734 F.3d 554, 559–60 (6th Cir. 2013) (holding that factual issue existed as to whether periodic administrative segregation reviews were meaningful and supported by "some evidence"); *Toevs*, 685 F.3d at 914–15 (concluding that periodic reviews that were not "meaningful" violated prisoner's due process rights); *Kelly v. Brewer*, 525

F.2d 394, 399–402 (8th Cir. 1975) (remanding for further proceedings and directing warden to evaluate prisoners' placements based on "valid" present and future justifications rather than punishing an inmate for past conduct). Most recently, the Second Circuit held in *Proctor* that an inmate confined in the SHU for twenty-two years had raised triable issues of fact as to his due-process claim. *Proctor*, 846 F.3d at 612. Like Isby, Proctor's time in prison, was also "marked by violence and dangerous defiance of the law," which led to Proctor being placed in disciplinary segregation in the SHU. *Id.* at 602. Despite his behavior improving later on,[20] he was retained in administrative segregation in the SHU.[21] New York provided SHU inmates with periodic reviews every sixty days until they were returned to the general population. After explaining that meaningful periodic reviews must include ongoing evaluation of whether an inmate's continued segregation is justified, the Second Circuit noted that testimony from prison officials indicated that, based on Proctor's past conduct, they had no intention of releasing him. *Id.* at 611–12. The court explained that it was insufficient for officials merely to go through the motions of conducting a review when they had developed a pre-review conclusion that the inmate would

---

[20] The Second Circuit noted that, "in the main, Proctor's behavior [in administrative segregation] has remained positive," that he "has gone long stretches—including one period of almost four years—without any disciplinary reports," and that he "received just one disciplinary report between December 2011 and the close of the record in this case." 846 F.3d at 603.

[21] At the hearing held shortly thereafter, the hearing officer found that Proctor posed a threat to the prison based on his criminal history and misbehavior, including his past escape and his bad behavior during his first years in disciplinary segregation. 846 F.3d at 603.

remain in solitary confinement no matter what the evidence showed. *See id.* at 611 ("The state may not use Ad Seg as a charade in the name of prison security to mask indefinite punishment for past transgressions.").

Given the long stretches of time during which Isby had no serious disciplinary problems, as well as the conflicting evidence as to the reasons for his ongoing segregation, Isby has raised triable issues of material fact regarding whether his reviews were meaningful or pretextual. *See id.* at 610 ("Review with a pre-ordained outcome is tantamount to no review at all."). Here, the repeated issuance of the same uninformative language (without any updates or explanation of why continued placement is necessary) coupled with the length of Isby's confinement, could cause a reasonable trier of fact to conclude that Isby has been deprived of his liberty interest without due process. Moreover, our concerns with the thirty-day review process bring us to the ninety-day reviews, and the parties and the district court agree there is a disputed issue of material fact in Isby's case with respect to these more formal reviews. Further testimony and evidence at trial could clarify the reasons for Isby's ongoing segregation and convince a trier of fact that his reviews were not pretextual. However, his due process claim ought to have survived summary judgment.

### D. Qualified Immunity

Because the district court found no violation under the Fourteenth Amendment, it did not have to reach the question of qualified immunity. We now consider whether summary judgment on Isby's due process claim was nonetheless warranted on that ground. *See United States v. Flores-Sandoval*, 94

F.3d 346, 349 (7th Cir. 1996) (explaining that we are free to affirm "on any grounds found in the record, regardless of the rationale employed by the district court") (citation omitted).

In considering whether qualified immunity applies, we must inquire: "(1) whether the facts, taken in the light most favorable to the plaintiff, show that the defendant violated a constitutional right; and (2) whether that constitutional right was clearly established at the time of the alleged violation." *Hernandez v. Cook Cty. Sheriff's Office*, 634 F.3d 906, 914 (7th Cir. 2011) (citation omitted). "To be clearly established at the time of the challenged conduct, the right's contours must be sufficiently clear that every reasonable official would have understood that what he is doing violates that right, and existing precedent must have placed the statutory or constitutional question beyond debate." *Gustafson v. Adkins*, 803 F.3d 883, 891 (7th Cir. 2015) (citation omitted).

It is well established that whenever process is constitutionally due, no matter the context, it must be granted in a meaningful manner. *Cf. Armstrong v. Manzo*, 380 U.S. 545, 552 (1965). That said, we must also be cautious about defining the due process violation at issue here "at the appropriate level of specificity." *Figgs v. Dawson*, 829 F.3d 895, 905 (7th Cir. 2016) (citation omitted). There is no Seventh Circuit or Supreme Court case establishing exactly that periodic reviews of administrative segregation like those at issue here violate due process. "However, a case holding that the exact action in question is unlawful is not necessary." *Alicea*, 815 F.3d at 291 (citation omitted). After all, prison officials have been on notice since *Hewitt* that periodic reviews of administrative segregation are constitutionally required, and it is self-evident that they cannot be a sham.

Although some appellate courts that have considered this issue have concluded that qualified immunity applied, *see, e.g., Toevs*, 685 F.3d at 916 ("we cannot conclude that the state of the law from 2005 to 2009 gave defendants fair warning that the [Quality of Life Level Program] review process [for prisoners in administrative segregation] was not meaningful, or that the lack of reviews at QLLP Levels 4 through 6 was a due-process violation"), in the case at hand, the various factual disputes discussed above preclude summary judgment on the basis of qualified immunity. *See Selby*, 734 F.3d at 560 ("When no facts are in dispute, whether an official receives qualified immunity is a question of law. But in this case, … facts are in dispute, precluding summary judgment for the defendants.") (emphasis, citations, and internal quotation marks omitted); *Black*, 4 F.3d at 450 ("[W]e cannot determine from the record before the trial court whether the facts as to the kind and frequency of review given to Black are as he says they are or as the defendants say they are. Therefore a genuine issue of fact remains as to whether Black received the process required by *Hewitt*. [S]ummary judgment on the grounds of qualified immunity was not appropriate"). As Isby may be able to convince the trier of fact that defendants-appellees have been deliberately giving him meaningless "reviews," without any intention of ever releasing him from the SCU, qualified immunity may not apply.

### III. Conclusion

For the foregoing reasons, Isby is ordered to pay in full all outstanding fees to this Court and the district court, and we AFFIRM the district court on Isby's Eighth Amendment claim and REVERSE and REMAND on his Fourteenth Amendment claim.