2020 IL App (3d) 170719

Opinion filed July 29, 2020

_____

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2020

| | | |
|---|---|---|
| CHARLES KUCINSKY, | ) | Appeal from the Circuit Court |
| | ) | of the 12th Judicial Circuit, |
| Plaintiff-Appellant, | ) | Will County, Illinois. |
| | ) | |
| v. | ) | |
| | ) | |
| RANDY PFISTER, Individually and in His | ) | |
| Official Capacity as Warden of the Pontiac | ) | |
| Correctional Center; JOEL STARKEY; | ) | Appeal No. 3-17-0719 |
| GREGORY KOCHEL; and EDWARD VILT, | ) | Circuit No. 16-MR-3156 |
| | ) | |
| Defendants | ) | |
| | ) | |
| (Randy Pfister, Individually and in His Official | ) | |
| Capacity as Warden of the Pontiac Correctional | ) | |
| Center; Gregory Kochel; and Edward Vilt, | ) | Honorable |
| | ) | Arkadiusz Z. Smigielski, |
| Defendants-Appellees). | ) | Judge, presiding. |

_____

JUSTICE CARTER delivered the judgment of the court, with opinion.
Presiding Justice Lytton and Justice O'Brien concurred in the judgment and opinion.

_____

**OPINION**

¶ 1     Plaintiff, Charles Kucinsky, an inmate in the Illinois Department of Corrections (IDOC),
filed a *pro se* first amended complaint pursuant to section 1983 of the federal Civil Rights Act
(42 U.S.C. § 1983 (2012)) against defendants, Randy Pfister (individually and in his official
capacity as the warden of the Pontiac Correctional Center (Pontiac)) and three Pontiac internal

affairs intelligence officers—Joel Starkey, Gregory Kochel, and Edward Vilt, in their individual capacities.[1] Defendants filed a motion to dismiss Kucinsky's first amended complaint. The trial court granted defendants' motion to dismiss and dismissed Kucinsky's complaint with prejudice. Kucinsky appealed, arguing the trial court erred. We affirm in part, reverse in part, and remand to the trial court for further proceedings.

¶ 2                                    I. BACKGROUND

¶ 3        On May 15, 2008, a jury found Kucinsky guilty of first degree murder and attempted first degree murder, and Kucinsky was sentenced to consecutive terms of 55 years and 30 years of imprisonment. *People v. Kucinsky*, 2013 IL App (1st) 111073-U, ¶¶ 4, 13, 45, 50 (affirming). The evidence at Kucinsky's trial showed that he was a member of the Latin Kings and the shooting was gang related. *Id.* ¶ 4.

¶ 4        On August 29, 2012, while he was an inmate at the Menard Correctional Center (Menard), Kucinsky was served with a disciplinary report accusing him of "violent assault" and "dangerous disturbance" two days after he was involved in a physical altercation with correctional officer, Lieutenant Mitchell. *Kucinsky v. Illinois Department of Corrections*, 2018 IL App (1st) 171567-U, ¶ 5. Kucinsky was, thereafter, transferred to Pontiac.

¶ 5        On September 5, 2012, a disciplinary hearing took place before the Pontiac adjustment committee, with the final summary report indicating that Kucinsky had pled guilty. *Id.* ¶ 6. The adjustment committee found Kucinsky guilty and made disciplinary recommendations (one year in "C grade," indeterminate segregation, revocation of one year of good-conduct credits, six months of yard restriction, one year of audio/visual restriction, and six months of "contact visits

---

[1]Joel Starkey was a named defendant but was not served, did not appear as a defendant in the trial court, and is not an appellee in this matter on appeal.

restrictions"). *Id.* Kucinsky filed a petition for writ of *certiorari* in the circuit court, arguing he had been denied due process because he was not allowed to call witnesses at the disciplinary hearing and the hearing report erroneously stated that he had pled guilty. *Id.* ¶ 7. On September 11, 2015, by agreement of the parties, the circuit court remanded the matter for a new hearing. *Id.* After a new disciplinary hearing on January 19, 2016, the adjustment committee again found Kucinsky guilty and made the same disciplinary recommendations. *Id.* ¶ 8.

¶ 6        On December 14, 2016, Kucinsky filed a *pro se* complaint in this case, which he amended on March 31, 2017. In his *pro se* first amended complaint, Kucinsky alleged claims pursuant to section 1983 of the federal Civil Rights Act, arguing that his constitutional rights were violated. He requested $20,000 in compensatory damages, $40,000 in punitive damages, and any other relief the court deemed just and proper in the interest of justice.

¶ 7        In count I, Kucinsky alleged that defendants Vilt, Kochel, and Starkey violated his first amendments rights by deliberately retaliating against him by placing him in administrative detention for attempting to assist his attorney in preparing a defense, filing a civil complaint against the Pontiac adjustment committee, criticizing IDOC and the prison system in his mail, and authoring grievances against defendants. Kucinsky also alleged that defendants Vilt, Kochel, and Starkey violated his first amendment rights by deliberately not delivering his outgoing and incoming mail, as well as censoring his mail because of the political views expressed therein.

¶ 8        In count II, Kucinsky alleged that defendants Vilt, Kochel, and Starkey violated his right to due process and IDOC's own rules in relation to interference with his mail. Kucinsky also alleged that defendants Vilt, Kochel, Starkey, and Pfister violated his right to due process by placing him on administrative detention status in the "north administrative detention building" while knowing that doing so would cause him atypical and significant hardship, providing vague

3

notice of administrative detention consideration, and conducting "sham" hearings when placing him on administrative detention status indefinitely. Kucinsky further alleged that Pfister violated his right to due process by promoting and conducting a policy resulting in vague notices of administrative detention hearings, leading to Kucinsky being unable to develop a defense and resulting in a sham hearing.

¶ 9    In count III, Kucinsky alleged defendants Vilt, Kochel, Starkey, and Pfister violated his eighth amendment right to be free from cruel and unusual punishment. Kucinsky alleged that he was subjected to various adverse conditions in the "north administrative detention building" and defendants knew those conditions would cause pain, suffering, mental deterioration, and physical injury and knew those conditions were especially "toxic" to Kucinsky because of his "mental illness."

¶ 10    In count IV, Kucinsky alleged a "conspiracy" claim against defendants Vilt, Kochel, and Starkey. Kucinsky argued that Vilt, Starkey, Kochel, and other unnamed internal affairs officers conspired against him to interfere with his access to the courts, censor his mail in retaliation for writing grievances against internal affairs officers, and kept him in administrative detention "indefinitely." He also alleged that Pfister conspired against him by "turning a blind eye" to the conduct of the other defendants and other internal affairs officers.

¶ 11    In count V, Kucinsky alleged a "misfeasance" claim against defendants Vilt, Kochel, Starkey, and Pfister in that they breached their duty to follow federal and state laws and administrative rules and regulations by deliberately and improperly using their authority to conspire against him and violate his constitutional rights (under the first, eighth, and fourteenth amendments) and by deliberately violating regulations set forth in sections 525.130 and 525.140

4

of Title 20 of the Illinois Administrative Code regarding the handling of incoming and outgoing mail (see 20 Ill. Adm. Code 525.130, 525.140 (2003)) "in an illegal act of retaliation."

¶ 12 In support of his claims, Kucinsky made the following allegations and attached documents to his *pro se* first amended complaint, including some of the various related grievances he allegedly filed. Kucinsky was an inmate at Pontiac from late August 2012 until August 2016. Defendant Pfister was the warden of Pontiac and defendants Starkey, Vilt, and Kochel were internal affair officers.

¶ 13 On July 25, 2013, Kucinsky had received "some discovery materials" to assist his attorney in preparing a "defense." Kucinsky sent some of the documents to the prison's law library for copying, but the materials were not returned. The discovery materials Kucinsky had sent for copying included hand-copied duplicates of e-mails between prison staff referencing an interview that took place with an inmate regarding gang activity. (Kucinsky attached copies of those e-mails to his first amended complaint as "exhibit 5."[2]) Two days after sending the discovery materials to be copied, Kucinsky's prison cell was searched, Kucinsky was strip searched, and all his property was taken. A week later, most of Kucinsky's property was returned, except some additional discovery materials were missing.

¶ 14 In August 2013, Kucinsky was interviewed by Vilt and Kochel regarding the hand-duplicated e-mails. Vilt and Kochel attempted to pressure Kucinsky into stating he distributed

---

[2]Exhibit 5 included hand-copied e-mails, including a copy of an e-mail sent from Kochel to Vilt on October 12, 2012, referencing an interview with an inmate on that day by the Pontiac "Intel Unit." The inmate indicated that certain inmates at Menard (where Kucinsky had been incarcerated until the end of August 2012) had discussed potential assaults on specific correctional officers at Menard "as a way to let everyone know the [Latin] Kings were for real." A "hit" was ordered on a certain correctional officer to be carried out by Kucinsky as a way for Kucinsky "to get back in the good graces of the [Latin] Kings," but Kucinsky "ended up in segregation." Once released from segregation, Kucinsky was ordered to perform a "hit" on Lieutenant Mitchell. Another hand-duplicated e-mail indicated that on October 15, 2012, Vilt forwarded the e-mail regarding that interview to Starkey (and four other persons).

5

copies of the "exhibit 5" e-mails to other prisoners, but Kucinsky denied doing so and explained that he was in possession of those materials to assist his attorney. Vilt and Kochel were "outraged" because they believed Kucinsky was responsible for distributing the e-mails, which contained their names. Vilt threatened to place Kucinsky on "mail watch," harass his mail, and place him on administrative detention status. Kochel told Kucinsky that he would make prison life "very hard," which would include "mail problems." Kucinsky was, in fact, subsequently placed on mail watch and "A.D. status (A.D. tracking system)" without formal or written notice. On September 5, 2013, Kucinsky "turned in" a grievance form regarding his confiscated legal documents, the search of his prison cell, and the interview, but the grievance was "ignored."

¶ 15    On January 3, 2014, when Kucinsky was returning from a hearing at the circuit court, Vilt, Kochel, and Starkey "ambushed" him. Starkey searched Kucinsky and his documents. Starkey confiscated some "exhibits" pertaining to a civil suit that Kucinsky had "mailed in" against the adjustment committee. Starkey told Kucinsky, "If I were you, I wouldn't pursue that litigation against the Pontiac adjustment committee because you wouldn't want to feel my wrath." Kochel said that Kucinsky was going to pay for the grievance filed against him in September. Vilt said that Kucisnky would never leave Pontiac, Kucinsky would be "stuck" in administrative detention, and if Kucinsky ever wanted his mail to go out then he had better stop criticizing the prison system in his mail. After searching Kucinsky, Starkey read through his legal work and confiscated legal documents (including examples that Kucinsky was going to use to draft a complaint). Kucinsky was not given a shakedown or confiscation form for the legal work that was taken, and there was no justification for the taking of his legal work.[3]

_____

[3]The grievance attached to the first amended complaint shows that the grievance was denied by the grievance counselor on February 11, 2014, with the grievance counselor indicating there had been a "shakedown slip" for January 3, 2014, and that possessing other inmates' names and numbers and possessing photographs of national level street gang leaders violated IDOC's rules and there had been no

¶ 16    Kucinsky also alleged that in 2013 and 2014, he authored monthly editorials regarding the criminal justice system, prison system, and other subjects and mailed those editorials to "newspapers and other places," including a prison rights group. In 2014, Kucinsky was notified by a volunteer from one of those groups that his mailings were not being received. He was also not receiving monthly newsletters sent to him from the prison rights group. He only received three of the monthly newsletters sent to him between August 2013 and August 2016.

¶ 17    On June 20, 2014, he received a "legal letter" from "an attorney" that was marked as "legal mail" that had been previously opened. On August 5, 2014, Kucinsky filed a grievance in which Kucinsky referenced another opened legal letter he received on August 4, 2014, from attorney, Myron F. Mackoff, which had been clearly marked as legal mail. He also described the "ongoing problem" with his mail, indicating he received opened legal mail; he was not receiving mailings from "prison groups"; any outgoing mail in which he "express[ed] himself and [his] political views" was not being sent to his addressees; his mail had been censored since July or August 2013 and, since that time, "countless mail," wherein he "express[ed] his opinions about the prison, justice system, or community issues," was not being sent out from him and mail sent from community or prisoner rights group to him was not being delivered to him; in "early 2014" he sent a letter to Gail Hardy but she did not receive that letter, in which he had "expressed himself" about slavery and the Illinois government; since August 2013, he received "no mail" from "Southwest News published by Affordable Power" that had been sent to him, and he did not receive monthly mail sent to him from his friend, Joseph Cohen; since August 2013, letters from Kucinsky's parents were not delivered to him and were not returned to his parents; there

explanation from Kucinsky as to how he came to possess the contraband items or how the contraband pertained to his pending charges. Kucinsky sought review by the administrative review board on July 16, 2014, and after review, the administrative board denied the grievance on December 29, 2014.

were additional people that had sent Kucinsky mail, which he also did not receive; and Kucinsky knew officers Vilt, Starkey, Kochel, and the whole Pontiac Intelligence Unit were involved with the tampering with his mail in retaliation for him not cooperating with the "Intel Unit" in July and August 2013, at which time Vilt had threatened to destroy Kucinsky's mail and make prison life hard for Kucinsky.

¶ 18   On September 16, 2014, Kucinsky received a letter, which indicated that Hardy did not receive Kucinsky's last letter and that she had mailed him a letter, which he did not receive. Kucinsky filed a grievance on September 22, 2014, indicating a "pattern" of interference with his mail that contained discussions of his political views, prison conditions, criticisms of the government, or criticisms of the prison system. During a visit on September 19, 2014, he was informed that within the past month three letters had been sent to him from his dad and one letter had been sent to him from Cohen, none of which he ever received.[4]

¶ 19   On April 30 and October 15, 2014, Kucinsky "notified" Pfister about "his mail censorship issue and retaliation by the internal affairs unit." Pfister "turned a blind eye" to those issues.

¶ 20   On October 19, 2014, as a result of a visit he received, Kucinsky learned that in the last 60 days, Roberto Guzman had sent him a letter, which he never received. Kucinsky's mail had been censored where it related to his expression of his political views and his concerns or complaints about the prison system and Illinois government. Kucinsky had not received twice-monthly mailings sent to him from "Affordable Power" since July 2013 or twice-monthly telegrams from Cohen since February 2014.

---

[4]The response to Kucinsky's grievance was that the mailroom had indicated they were current on the mail.

¶ 21 On November 9, 2014, there was a shakedown of Kucinsky's prison cell by Officer Graham, during which Graham threatened that if Kucinsky did not drop the civil lawsuit against the adjustment committee and stop writing grievances against the internal affairs staff, then Kucinsky's television would be broken and his personal belongings would be destroyed. During the shakedown, Graham confiscated 205 pages of Kucinsky's trial transcripts pertaining to his criminal case, a federal *habeas* book, a rights of prisoners book, and grievances. Kucinsky indicated that it was at least the third time that his prison cell was shaken down by Graham and that Graham had confiscated his paperwork and family photos, ransacked his cell, and told him to stop litigating civil complaints. Shaking down Kucinsky's cell had become a common practice in retaliation for filing grievances about prison conditions. Kucinsky indicated that since being moved to his current cell, his cell was shaken down "at least twice a month" without him being provided shakedown slips.

¶ 22 On November 20, 2014, Kucinsky was visited by Cohen, who notified him that United Voices for Prisoners and Affordable Power had mailed Kucinsky at least two letters in the past month, which Kucinsky had not received. Cohen had sent him one letter per month in the last 90 days, which Kucinsky did not receive.

¶ 23 On December 17, 2014, when Kucinsky was returning from court, he was searched by Starkey. Starkey asked Kucinsky if he was enjoying the "hard time" for Kucinsky filing the civil suit against the adjustment committee and for filing grievances against him and members of the internal affairs unit. Starkey also indicated he was responsible for the cell shakedown by Graham on November 9, 2014.

¶ 24 Kucinsky additionally alleged that on January 13, 2015, he received open legal letters from "an attorney" clearly marked as "legal." Kucinsky was placed in the "north" administrative

9

detention building on February 9, 2015. In March 2015, Kucinsky received a notice of an administrative detention hearing that was so vague he could not prepare a defense, and he had been subjected to a "sham" administrative detention hearing. Between February 2015 and August 2016, at least 10 of Kucinsky's grievances were thrown away by the internal affairs unit, including by Kochel. On August 4, 2015, Kochel told Kucinsky to stop criticizing IDOC in his mail or his mail would not go out.

¶ 25        On September 17, 2015, Kucinsky received an open legal letter from his attorney who had been representing him "against the Pontiac adjustment committee." The letter indicated that he had "won his civil suit."[5] The next day, Kucinsky's prison cell was ransacked by the weapons task force (part of the internal affairs unit), and his property was damaged and stolen, including his lamp, headphones, razor, soaps, cable cord splitter, cup, and face towel, but he only received a shakedown slip regarding the lamp and the headphones. The officers conducting the shakedown denied taking his other items.

¶ 26        Kucinsky additionally alleged that he was subjected to poor prison conditions. Specifically, he alleged that he was placed in the "north" administrative detention unit on February 9, 2015, in a "filthy" cell that was previously maced but not cleaned; the cell was not any larger than two steps long and one step wide; he had little to no access to natural light; he was exposed to 24-hour bright lights, mace, and extreme noise; and his movement in the cell was limited, preventing him from exercising. He also contended that he was given small meal portions, lacked meaningful cleaning supplies, was exposed to extreme temperatures (extreme cold in the winter and extreme heat in the summer), was exposed to mice infestation, lacked

---

[5]As discussed *supra* ¶ 5, Kucinsky had filed a petition for writ of *certiorari* in the circuit court regarding the disciplinary hearing that took place on September 5, 2012, and on September 11, 2015, the circuit court entered an ordering remanding the matter for a new hearing.

10

socialization, and was only allowed limited noncontact visits. He was confined to his cell for almost 24-hours per day. The cell had a solid door that made communication with those outside the cell difficult and resulted in "constant banging" on the doors in the unit. He had limited access to recreation yards with unmeaningful recreation activities. Mace was regularly sprayed in the unit, causing him to choke and struggle to breathe and causing his eyes to burn. He further alleged that he lacked cleaning supplies to maintain sanitary conditions.

¶ 27    On January 12, 2016, and June 1, 2016, he mailed two letters to the Chicago Police Department, which were never delivered.

¶ 28    At his administrative detention hearing on January 19, 2016,[6] Kochel served as a committee member and told Kucinsky that Kucinsky would be released from administrative detention when Kucinsky stopped filing grievances, stopped filing civil suits against IDOC, and stopped criticizing IDOC and the prison system in his mailings. Kucinsky alleged that on January 20, 2016, he filed a grievance regarding that administrative detention hearing, but it was "ignored." In the grievance, Kucinsky indicated he received a vague notice regarding the administrative detention hearing; Kochel was "hostile" toward him in retaliation for Kucinsky filing numerous grievances against Kochel; and as a result of his continued placement in administrative detention, he suffered atypical and significant hardship due to the various alleged conditions. He requested that "all retaliation end and [he] be placed in general population." Kucinsky had been placed on administrative detention "indefinitely" and had notified Pfister about the conditions of confinement, but Pfister turned a "blind eye" despite Pfister having been made aware through a Vera Institute study that indicated disciplinary segregation and

---

[6]Kucinsky's new disciplinary hearing on remand from the circuit court was held on January 19, 2016. See *supra* ¶ 5. It is not clear if that is the hearing to which Kucinsky is referring.

11

administrative detention caused pain, suffering, mental deterioration, and physical injury, especially to someone like Kucinsky with a serious mental illness.

¶ 29    Defendants filed a combined motion to dismiss Kucinsky's first amended complaint pursuant to section 2-619.1 of the Code of Civil Procedure (Code) (735 ILCS 5/2-619.1 (West 2016)). Specifically, defendants sought to dismiss Kucinsky's first amended complaint pursuant to section 2-615 of the Code (*id.* § 2-615), arguing that Kucinsky's allegations were insufficient to state a claim pursuant to 42 U.S.C. § 1983. Defendants also sought to dismiss Kucinsky's complaint pursuant to section 2-619 of the Code (735 ILCS 2-619 (West 2016)), arguing Kucinsky's claims were barred under the doctrine of sovereign immunity.

¶ 30    On October 13, 2017, the trial court entered a written order, indicating "[t]he matter is dismissed with prejudice." Kucinsky appealed.

¶ 31                                    II. ANALYSIS

¶ 32    On appeal, Kucinsky argues the trial court erred in granting defendants' motion to dismiss because (1) he stated a first amendment retaliation claim, (2) he stated a claim for "unlawful mail censorship" and the denial of access to the courts, (3) he stated a claim under the eighth and fourteenth amendments regarding the conditions of his confinement, and (4) his claims were not barred by the doctrine of sovereign immunity. In response, defendants argue Kucinsky's allegations failed to state a claim. Defendants also contend that because the trial court's dismissal was proper for the failure to state a claim pursuant to section 2-615 of the Code, this court need not decide whether a dismissal pursuant to section 2-619 of the Code was proper.

¶ 33    A motion to dismiss under section 2-619.1 of the Code allows a party to combine a section 2-615 motion to dismiss with a section 2-619 motion to dismiss. *Schloss v. Jumper*, 2014 IL App (4th) 121086, ¶ 15. In reviewing a dismissal pursuant to either section 2-615 or 2-619 of

12

the Code, we accept as true all well-pleaded facts and all reasonable inferences that may be drawn from those facts and construe the allegations in the complaint in the light most favorable to the plaintiff. *Id.* ¶ 20. Exhibits attached to the complaint, incorporated by reference, are part of the complaint. *Bajwa v. Metropolitan Life Insurance Co.*, 208 Ill. 2d 414, 432 (2004) (documents attached to the pleading are treated as part of the pleading if the pleading specifically incorporates the documents by reference).

¶ 34        We review *de novo* the dismissal of a complaint pursuant to section 2-619.1 of the Code, regardless of whether the dismissal was based on the section 2-615 portion of the motion or the section 2-619 portion of the motion. *Schloss*, 2014 IL App (4th) 121086, ¶ 15. We may affirm an order dismissing a complaint on any basis supported by the record, regardless of the trial court's reasoning. *O'Callaghan v. Satherlie*, 2015 IL App (1st) 142152, ¶ 17.

¶ 35        In this case, the trial court granted defendants' section 2-619.1 motion to dismiss with prejudice but did not indicate under which section of the Code the motion to dismiss was granted and did not state any specific findings. The record contains no indication of the reason for the trial court's dismissal of Kucinsky's first amended complaint, in its entirety, with prejudice.

¶ 36                          A. Motion to Dismiss Pursuant to Section 2-619

¶ 37        A section 2-619 motion to dismiss admits the sufficiency of the complaint but asserts an affirmative defense or other matter that avoids or defeats the claim. *Carr v. Koch*, 2012 IL 113414, ¶ 27. The question on appeal when a cause of action is dismissed pursuant to section 2-619 is whether there is a genuine issue of material fact and whether defendant is entitled to a judgment as a matter of law. *Illinois Graphics Co. v. Nickum*, 159 Ill. 2d 469, 494 (1994).

¶ 38                              1. Subject Matter Jurisdiction

13

¶ 39 Here, we begin with a review of the trial court's subject matter jurisdiction. See *Ardt v. Illinois Department of Professional Regulation*, 154 Ill. 2d 138, 145-46 (1992) (the lack of subject matter jurisdiction deprives the trial court of all power except to dismiss the action). The Illinois Constitution provides, "Circuit Courts shall have original jurisdiction of all justiciable matters except when the Supreme Court has original and exclusive jurisdiction ***." Ill. Const. 1970, art. VI, § 9. Illinois circuit courts are courts of general jurisdiction "and are presumptively competent to adjudicate claims arising under the laws of the United States." *Blount v. Stroud*, 232 Ill. 2d 302, 328 (2009) (citing *Yellow Freight System, Inc. v. Donnelly*, 494 U.S. 820, 823 (1990)). Both state and federal courts have jurisdiction over claims brought pursuant to 42 U.S.C. § 1983. *Haywood v. Drown*, 556 U.S. 729, 731 (2009); *Bilski v. Walker*, 392 Ill. App. 3d 153, 155 (2009) (Illinois circuit courts have jurisdiction to adjudicate section 1983 claims).Thus, the circuit court had jurisdiction to grant relief pursuant to section 1983.

¶ 40                                      2. Sovereign Immunity

¶ 41 Defendants argued that Kucinsky's claims for compensatory and punitive damages were barred by the doctrine of sovereign immunity. In their motion to dismiss, defendants cited section 1 of the State Lawsuit Immunity Act (Immunity Act) (745 ILCS 5/1 (West 2016)) as barring Kucinsky's action seeking monetary damages against the State. Defendants additionally cited the United States Supreme Court's decision in *Will v. Michigan Department of State Police*, 491 U.S. 59, 71 (1989), for the proposition that neither a state, nor its officials acting in their official capacities, are "persons" who can be sued under section 1983.

¶ 42 "Sovereign immunity is a common-law doctrine that bars lawsuits against the government unless the government consents to be sued." *Jackson v. Alverez*, 358 Ill. App. 3d 555, 559 (2005) (citing *City of Shelbyville v. Shelbyville Restorium, Inc.*, 96 Ill. 2d 457, 461

14

(1983)). The purpose of this doctrine is to protect states from interference with performing government functions and "to preserve and protect State funds." *Toth v. England*, 348 Ill. App. 3d 378, 387 (2004). Determining whether sovereign immunity is applicable is a determination as to whether the circuit court has subject matter jurisdiction of the suit. *Fritz v. Johnston*, 209 Ill. 2d 302, 308-09 (2004); *Smith v. Jones*, 113 Ill. 2d 126, 130-31 (1986) (the circuit court lacks subject matter jurisdiction over claims where sovereign immunity applies).

¶ 43 The Illinois Constitution of 1970 abolished sovereign immunity "[e]xcept as the General Assembly may provide by law." Ill. Const. 1970, art. XIII, § 4. Pursuant to its constitutional authority, the General Assembly reestablished sovereign immunity by enacting the Immunity Act. See Pub. Act 77-1776, § 1 (eff. Jan. 1, 1972) (adding Ill. Rev. Stat. 1973, ch. 127, ¶ 801, now codified at 745 ILCS 5/0.01 *et seq.*). Section 1 of the Immunity Act provides that, except as provided in the Court of Claims Act[7] (705 ILCS 505/1 *et seq.* (West 2016)) and other specified statutes, "the State of Illinois shall not be made a defendant or party in any court." 745 ILCS 5/1 (West 2016).

¶ 44 Section 1983 of the federal Civil Rights Act allows a plaintiff to bring a civil rights claim to vindicate the deprivation of federal constitutional or statutory rights under the color of law. 42 U.S.C. § 1983; *Murray v. Poani*, 2012 IL App (4th) 120059, ¶ 16. Section 1983 provides:

> "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities

---

[7]The Court of Claims Act (705 ILCS 505/1 *et seq.* (West 2016)) creates a forum for certain actions brought against the State. *Parmar v. Madigan*, 2018 IL 122265, ¶ 20.

secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress." 42 U.S.C. § 1983.

¶ 45                                a. Official Capacity Claim

¶ 46        A lawsuit that makes a state official a defendant in his official capacity is not a suit against the individual but, rather, is a suit against the official's office and, as such, is no different from a suit against the State itself. *Will*, 491 U.S. at 71; *Smith*, 113 Ill. 2d at 131 (official acts of state officers are in effect acts of the State itself). Since the United States Supreme court has construed the word "person" in section 1983 to exclude States, neither a federal court nor a state court may entertain a section 1983 action against such a defendant. *Will*, 491 U.S. at 70-71 (holding that an entity with eleventh amendment immunity is not a "person" within the meaning of section 1983; neither a state nor its officials acting in their official capacities are "persons" who can be sued under section 1983); *Howlett v. Rose*, 496 U.S. 356, 376 (1990) (states and arms of the states, which have traditionally enjoyed eleventh amendment immunity, are not subject to suit under section 1983 in either federal court or state court).[8]

¶ 47        In this case, the IDOC is a state entity. See 730 ILCS 5/3-2-1 *et seq.* (West 2016); *People v. Lashley*, 2016 IL App (1st) 133401, ¶¶ 50-51 (the IDOC, as described in Chapter III of the Unified Code of Corrections (730 ILCS 5/ch. III (West 2016)), is a state entity). Therefore, a suit against Pfister, in his official capacity as the warden of Pontiac, was a suit against IDOC, a state entity, and thus, a suit against the state. Consequently, the circuit court could not entertain a

---

[8]However, state officials sued for injunctive relief are "persons" within the meaning of section 1983 because official-capacity actions for prospective relief are not treated as an action against the State. *Will*, 491 U.S. at 71 n.10.

16

section 1983 action for damages against Pfister in his official capacity. See *Howlett*, 496 U.S. at 376 (the word "person" in section 1983 does not encompass states).

¶ 48 We, therefore, affirm the trial court's dismissal with prejudice of the first amended complaint as to Pfister in his official capacity. Given that determination, we need not address the issue of whether this state's Immunity Act also would have precluded Kucinsky's section 1983 claims in the circuit court against Pfister in his official capacity.[9]

¶ 49 b. Individual Capacity Claims

¶ 50 Even when a plaintiff's claims are brought exclusively against individuals, our supreme court has recognized that actions against state employees must sometimes be characterized as actions against the State. *Fritz*, 209 Ill. 2d at 310. The prohibition against making the State a party to a suit cannot be evaded by making an action nominally against the servants or agents of the State when the real claim is against the State. *Leetaru v. Board of Trustees of the University of Illinois*, 2015 IL 117485, ¶ 45. The determination of whether an action is a suit against the State depends upon the issues involved and the relief sought, rather than the formal designation of the parties. *Id.* ¶¶ 44-45.

¶ 51 A claim against a state official or employee is a claim against the "state" when (1) there are no allegations that an agent or employee of the State acted beyond the scope of his authority through wrongful acts, (2) the duty alleged to have been breached was not owed to the public generally independent of the fact of State employment, and (3) the actions complained of involve matters ordinarily within that employee's normal and official functions for the State. *Murphy v. Smith*, 844 F.3d 653, 658 (7th Cir. 2016); *Robb v. Sutton*, 147 Ill. App. 3d 710, 716 (1986) (acts

---

[9]To the extent that defendants argue that the Immunity Act provides immunity to the State beyond that provided by section 1983, we also need not address that argument.

17

performed by state agents within the scope of their official duties are to be regarded as acts of the State). Nonetheless, sovereign immunity affords no protection when it is alleged that servants or agents of the State have acted in violation of statutory or constitutional law or in excess of their authority. *Leetaru*, 2015 IL 117485, ¶ 46 ("while legal official acts of state officers are regarded as acts of the State itself, illegal acts performed by the officers are not"). When a state employee performs illegally, unconstitutionally, or without authority, the conduct is not considered to be conduct of the State, and a suit may be maintained against the employee in his individual capacity. See *Fritz*, 209 Ill. 2d at 313 (holding Illinois's sovereign immunity was not applicable where plaintiff alleged the criminal offense of disorderly conduct because the duty not to make false accusations of criminal conduct is imposed by the Criminal Code of 1961 (720 ILCS 5/1-1 *et seq.* (West 1998))) and not by virtue of defendants' state employment); *Murphy*, 844 F.3d at 660 (holding Illinois's sovereign immunity did not bar an inmate's section 1983 claim or battery claim where plaintiff alleged and proved that the defendants violated the United States Constitution and alleged the factual elements of aggravated battery).

¶ 52    In reviewing defendants' contention of sovereign immunity, as set forth in their motion to dismiss pursuant to section 2-619 of the Code, we note that defendants admit the legal sufficiency of the complaint for the purposes of their section 2-619 motion. See *Carr*, 2012 IL 113414, ¶ 27. Kucinsky alleged defendants acted in violation of constitutional law and in excess of their authority—conduct for which sovereign immunity affords no protection. See *Leetaru*, 2015 IL 117485, ¶ 50. Accordingly, sovereign immunity did not apply to Kucinsky's claims against the defendants in their individual capacities.

¶ 53                                 B. Dismissal Pursuant to Section 2-615

¶ 54    A section 2-615 motion to dismiss attacks the legal sufficiency of a complaint based on defects that are apparent on its face. *Salvi v. Village of Lake Zurich*, 2016 IL App (2d) 150249, ¶ 25. The question presented by a section 2-615 motion to dismiss is whether sufficient facts are contained in the pleadings that, if established, could entitle the plaintiff to relief. *Illinois Graphics Co.*, 159 Ill. 2d at 488. A motion to dismiss pursuant to section 2-615 should not be granted unless it is clearly apparent that no set of facts could be proven that would entitle the plaintiff to a recovery. *Tedrick v. Community Resource Center, Inc.*, 235 Ill. 2d 155, 161 (2009). However, the plaintiff must allege sufficient facts to bring a claim within a legally recognized cause of action. *Marshall v. Burger King Corp.*, 222 Ill. 2d 422, 429-30 (2006).

¶ 55    In determining whether a complaint should be dismissed on the pleadings pursuant to section 2-615, we note that Illinois is a fact-pleading jurisdiction. *Id.* at 429 (our supreme court has repeatedly stated that "Illinois is a fact-pleading jurisdiction"); see also 735 ILCS 5/2-601 (West 2016) (providing that in civil practice, "substantial allegations of fact" are necessary to state a cause of action). Fact pleading imposes a heavier burden on the plaintiff, so that a complaint that would survive a motion to dismiss in a notice-pleading jurisdiction (*e.g.*, in federal court) might not do so in a fact-pleading jurisdiction. See *City of Chicago v. Beretta U.S.A. Corp.*, 213 Ill. 2d 351, 368 (2004); *cf. Baxter v. Vigo County School Corp.*, 26 F.3d 728, 734 (7th Cir. 1994) (providing there are no heightened pleading requirements for civil rights actions in federal court beyond Rule 8(a) of the Federal Rules of Civil Procedure—"a short and plain statement of the claim showing that the pleader is entitled to relief" (internal quotation marks omitted) (citing *Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit*, 507 U.S. 163, 168 (1993))); *Walker v. Thompson*, 288 F.3d 1005, 1007 (7th Cir. 2002) (in federal suits there is no requirement of pleading the facts or the elements of a claim). While the

19

plaintiff need not plead evidence to meet Illinois's fact-pleading requirements, mere conclusions are insufficient to withstand a motion to dismiss. *Marshall*, 222 Ill. 2d at 429-30.

¶ 56 Additionally, "[p]leadings shall be liberally construed with a view to doing substantial justice between the parties." 735 ILCS 5/2-603(c) (West 2016). However, the requirement that a complaint set forth facts necessary for recovery cannot be satisfied, in favor of liberal construction, without the necessary allegations. *Beretta*, 213 Ill. 2d at 368. In determining whether a cause of action has been stated, "the whole complaint must be considered, rather than taking a myopic view of a disconnected part." *People ex rel. Scott v. College Hills Corp.*, 91 Ill. 2d 138, 145 (1982) (citing *Stenwall v. Bergstrom*, 398 Ill. 377, 383 (1947)). Furthermore, *pro se* civil rights complaints are to be given a liberal construction. *Webb v. Lane*, 222 Ill. App. 3d 322, 327 (1991) (citing *Haines v. Kerner*, 404 U.S. 519, 520 (1972) (per curiam)).

¶ 57 A civil rights complaint under section 1983 can be brought when a person whose conduct, under color of state law, has deprived another of any rights, privileges, or immunities secured by the constitution and laws. *Id.* at 326. A person pleading under section 1983 must allege (1) the conduct complained of was committed by a person acting under color of state law and (2) the conduct deprived the complainant of rights, privileges, or immunities secured by the constitution or other laws of the United States. *Id.* Under any theory, to be liable under section 1983, the individual defendant must have caused or have participated in a constitutional deprivation. *Pepper v. Village of Oak Park*, 430 F.3d 805, 810 (7th Cir. 2005); *Sheik-Abdi v. McClellan*, 37 F.3d 1240, 1248 (7th Cir. 1994) (to recover damages under section 1983, a plaintiff must establish that a defendant was personally responsible for the alleged deprivation of a constitutional right).

¶ 58                                      1. First Amendment Claims

20

¶ 59                                        a. Mail Interference

¶ 60        Kucinsky alleged that defendants Vilt, Kochel, and Starkey violated his first amendment

rights by interfering with his ability to send and receive mail. The free speech clause of the first

amendment applies to communications between an inmate and an outsider. *Martin v. Brewer*,

830 F.2d 76, 77 (7th Cir. 1987). "[A] prison inmate retains those First Amendment rights that are

not inconsistent with his status as a prisoner or with the legitimate penological objectives of the

corrections system." *Pell v. Procunier*, 417 U.S. 817, 822 (1974); *Bridges v. Gilbert*, 557 F.3d

541, 548-51 (7th Cir. 2009). Prisoners have a protected first amendment interest in sending and

receiving mail, and prison regulations or practices affecting the receipt of a prisoner's nonlegal

mail implicate first amendment rights and must be reasonably related to legitimate penological

interests. *Thornburgh v. Abbott*, 490 U.S. 401, 409 (1989).

¶ 61        In this case, Kucinsky alleged a continuing pattern of, and repeated occurrences of,

interference with his mail by prison officials, setting forth a first amendment claim. See

*Zimmerman v. Tribble*, 226 F.3d 568, 572 (7th Cir. 2000) (courts look to whether the plaintiff

alleges "a continuing pattern or repeated occurrences" of interference with mail to determine

whether there has been a first amendment violation); *Sizemore v. Williford*, 829 F.2d 608, 609-10

(7th Cir. 1987) (allegations that prison officials "repeatedly and intentionally" withheld

otherwise unobjectionable materials (a daily newspaper) from reaching the inmate-plaintiff were

sufficient to state a first amendment claim). Kucinsky alleged that defendants violated his first

amendment rights by interfering with his ability to send and receive mail but did not allege that

he suffered any additional injury because of the interference with his mail. Nonetheless, the

deprivation of a first amendment right standing alone is a cognizable injury. See *Rowe v. Shake*,

196 F.3d 778, 781-82 (7th Cir. 1999). Consequently, Kucinsky stated a first amendment claim related to the interference with his mail. Accordingly, we reverse the dismissal of this claim.

¶ 62                                   b. Retaliation Claim

¶ 63        Kucinsky also alleged that defendants Vilt, Kochel, and Starkey had repeatedly interfered with his mail, placed him in administration detention indefinitely (without adequate notice), and discarded his grievances in retaliation for Kucinsky stating that he did not distribute internal affairs e-mails to other prisoners when defendants were investigating the incident; assisting his attorney; filing a civil complaint against the Pontiac adjustment committee (presumably the writ of *certiorari*); criticizing IDOC, the prison system, and government in his mail; and authoring grievances against the Pontiac staff. Kucinsky also alleged that he notified Pfister of the mail and retaliation issues, but Pfister turned a blind eye.

¶ 64              i. Individual Capacity Retaliation Claims Against Vilt and Kochel

¶ 65        To state a claim for retaliation under the first amendment, a plaintiff must allege that a "prison officials retaliated against him for exercising a constitutionally protected right." *Pearson v. Welborn*, 471 F.3d 732, 738 (7th Cir. 2006). In asserting a first amendment retaliation claim, an inmate must allege that (1) he engaged in activity protected by the first amendment, (2) he experienced an adverse action that would likely deter first amendment activity in the future, and (3) the first amendment activity was "at least a motivating factor" in the defendants' decision to take the retaliatory action. (Internal quotation marks omitted.) *Bridges*, 557 F.3d at 546; *Fillmore v. Walker*, 2013 IL App (4th) 120533, ¶ 37.

¶ 66        As for first amendment activity, a prisoner retains those first amendment rights that are not inconsistent with his status as a prisoner or with the legitimate penological objectives of the prison system. *Pell*, 417 U.S. at 822. Defendants do not dispute that Kucinsky sufficiently

22

alleged that he engaged in conduct protected by the first amendment, and we agree with defendants' concession in this regard. See, *e.g.*, *Gomez v. Randle*, 680 F.3d 859, 866 (7th Cir. 2012) (inmates have a first amendment right to file nonfrivolous grievances against prison officials); *Rowe*, 196 F.3d at 782 (prisoners have protected first amendment interests in both sending and receiving mail); *McKinley v. Schoenbeck*, 731 F. App'x 511, 514 (7th Cir. 2018) (truthfully answering questions during an investigation is consistent with a prison's penological objectives). We conclude that Kucinsky sufficiently alleged that he engaged in conduct protected by the first amendment.

¶ 67     Kucinsky also sufficiently alleged that he experienced an adverse action that would likely deter first amendment activity in the future. An "adverse action" is one capable of deterring a person of ordinary firmness from exercising his or her constitutional right. *Bridges*, 557 F.3d at 552, 555. Defendants argue Kucinsky "failed to allege how or why" their alleged "adverse actions" might deter an ordinary inmate from engaging in protected first amendment activity. In support of their argument, defendants note that Kucinsky was, in fact, not deterred from exercising his first amendments rights, as evidenced by him continuing to file grievances and alleging that he filed other actions. However, the relevant standard for determining the effect the retaliation would have on an "ordinary prisoner" is not subjective but objective. See *Fillmore*, 2013 IL App (4th) 120533, ¶ 50 (noting that if the test were whether the plaintiff-inmate was subjectively chilled, no inmate would be able to obtain judicial relief from retaliation against first amendment activity because the very filing of the section 1983 lawsuit would prove that the retaliation was not chilling).

¶ 68     Here, Kucinsky alleged that he suffered retaliation through the defendant's adverse actions of a continuing pattern of interference with his mail (spanning approximately three

23

years), harassment by way of unexplained cell shakedowns, placement in administrative segregation indefinitely, and the destruction of his grievances. Accepting Kucinsky's allegations as true, we can infer that the adverse acts against Kucinsky, allegedly done by defendants and other internal affairs officers, over the course of three years, would deter a person of ordinary firmness from exercising his first amendment rights. See *Bridges*, 557 F.3d at 552 (construing an inmate's *pro se* complaint liberally and accepting the allegations as true, the court found that it could be inferred that "the alleged harassment by numerous prison employees in a variety of ways over a period of several months would deter a person of ordinary firmness from exercising his First Amendment rights"); *McKinley*, 731 F. App'x at 514 (placement in administrative detention may satisfy the burden of proving an adverse action likely to deter future first amendment activity); *Herron v. Harrison*, 203 F.3d 410, 416 (6th Cir. 2000) (allegations of five days spent in administrative segregation in retaliation for providing legal assistance to another prisoner sufficiently alleged an adverse action). Kucinsky sufficiently alleged he experienced adverse actions that would likely deter first amendment activity in the future.

¶ 69        Additionally, Kucinsky sufficiently alleged that his first amendment activity was "at least a motivating factor" in defendants' decision to take retaliatory action. "[A]n act in retaliation for the exercise of a constitutionally protected right is actionable under Section 1983 even if the act, when taken for different reasons, would have been proper." (Internal quotation marks omitted.) *Howland v. Kilquist*, 833 F.2d 639, 644 (7th Cir. 1987). Retaliatory motive can be proven through circumstantial evidence. See *Mays v. Springborn*, 575 F.3d 643, 650 (7th Cir. 2009) (retaliation could be inferred from a chronology of events presented by the plaintiff that included alleged threats).

¶ 70          In this case, Kucinsky alleged that after he denied distributing the internal affairs e-mails in August 2013, Vilt and Kochel threatened him with mail problems and he, in fact, began having mail issues around that time. A few months later, in January 2014, Kochel indicated Kucinsky was "going to pay" for filing a grievance in September, and Vilt threatened that Kucinsky would be "stuck" in administrative detention and his mail would not go out if he continued to criticize the prison system in his mail. Thereafter, Kucinksy continued to have issues with his mail; his legal documents were confiscated; he experienced repeated, unjustified, shakedowns of his cell; his property was confiscated without justification; and during cell shakedowns, he was threatened with additional harassment if he did not stop litigating against prison staff. Also, Kochel threw away at least 10 of Kucinsky's grievances, and at some point, Kucinsky was placed in administrative detention indefinitely, allegedly without proper notice and pursuant to a "sham" hearing. The day after receiving a previously opened legal letter indicating he "won" a civil suit against the Pontiac adjustment committee (presumably referring to the circuit court having ordered a new disciplinary hearing), Kucinsky's cell was ransacked. On August 4, 2015, Kochel reiterated his threat to interfere with Kucinsky's mail if Kucinsky did not stop criticizing IDOC in his mail, and Kucinsky continued to have issues with his mail. On January 19, 2016, Kochel threatened that Kucinsky would not be released from administrative detention until he stopped filing grievances and litigating against prison staff and stopped criticizing the prison system in his mail. We conclude that these allegations were sufficient to establish that Kucinsky's first amendment activity was "at least a motivating factor" in the defendants' decision to take retaliatory action. See, *e.g.*, *McKinley*, 731 F. App'x at 514-15 (inmate's placement in segregation coupled with defendants' comments could allow a reasonable jury to infer the inmate's protected speech was a motivating factor for his placement in

25

segregation and raised a genuine issue of material fact as to whether his placement in segregation was pretext for retaliation based on the prisoner's answers in investigative interview).

¶ 71 Kucinsky, therefore, sufficiently alleged a first amendment retaliation claim against defendants, Kochel and Vilt. Consequently, we reverse the trial court's dismissal of that claim against Kochel and Vilt.

¶ 72 ii. Individual Capacity Retaliation Claim Against Pfister

¶ 73 To recover damages under section 1983, a plaintiff must establish that a defendant was personally responsible for the deprivation of a constitutional right. *Gentry v. Duckworth*, 65 F.3d 555, 561 (7th Cir. 1995); *Jones v. City of Chicago*, 856 F.2d 985, 992 (7th Cir. 1988) (there is no principle of superiors' liability in tort law generally, or in the law of constitutional torts, so to be held liable for conduct of their subordinates in a section 1983 action, supervisors must have been personally involved in that conduct); see also *Polk County v. Dodson*, 454 U.S. 312, 325 (1981) (the theory of *respondeat superior* is not applicable in a section 1983 action). A defendant is personally responsible "if the conduct causing the constitutional deprivation occurs at [his] direction or with [his] knowledge and consent." (Internal quotation marks omitted.) *Gentry*, 65 F.3d at 561. Supervisors must know about the conduct and facilitate it, approve it, condone it, or turn a blind eye, acting either knowingly or with deliberate reckless indifference. *Jones*, 856 F.2d at 992-93. There must be some causal connection or affirmative link between the action complained about and the official sued for a section 1983 recovery. *Gentry*, 65 F.3d at 561. At a minimum, an official must fail to act "despite his knowledge of a substantial risk of serious harm." *Farmer v. Brennan*, 511 U.S. 825, 842 (1994).

¶ 74 Here, Kucinsky only alleged that on April 30 and October 15, 2014, he "notified" Pfister about "his mail censorship issue and retaliation by the internal affairs unit," and Pfister "turned a

blind eye," with no other allegations indicative of Pfister's participation. Given that Illinois is a fact-pleading jurisdiction, Kucinsky's allegations of providing Pfister with "notice" regarding the mail censorship and retaliation issues, without any indication as to the substance of the notice, were insufficient to establish Pfister's knowledge regarding Kucinsky's claims. See *id.* (at a minimum, an official must fail to act "despite his knowledge of a substantial risk of serious harm"); *Ashcroft v. Iqbal*, 556 U.S. 662, 677 (2009) (a government official can be held liable only for his own conduct). Therefore, we affirm the dismissal of Kucinsky's first amendment retaliation claim against Pfister in his individual capacity.

¶ 75                                   2. Due Process

¶ 76        On appeal, Kucinksy argues he sufficiently alleged a due process claim regarding his placement in administrative segregation. He also contends that he sufficiently alleged a due process claim regarding the censorship of his mail and the denial of access to the courts.

¶ 77        The due process clause of the fourteenth amendment prohibits states from "depriv[ing] any person of life, liberty, or property, without due process of law." U.S. Const., amend. XIV, § 1. To state a valid due process claim under section 1983 a plaintiff must allege he (1) has a protected life, liberty, or property interest; (2) has suffered a deprivation of that protected interest; and (3) was denied due process. *Webb*, 222 Ill. App. 3d at 326-27; *Isby v. Brown*, 856 F.3d 508, 524 (7th Cir. 2017).

¶ 78                             a. Administrative Detention

¶ 79        On appeal, Kucinsky argues that the trial court erred by dismissing his due process claim where he alleged that defendants placed him in administrative detention indefinitely, knowing that doing so would cause atypical and significant hardship, and defendants conducted "sham" administrative detention hearings where they provided vague notice and conducted unmeaningful

27

hearings. Defendants argue that the trial court did not err in dismissing Kucinsky's due process claim because he failed to allege that he was deprived of a protected liberty interest.

¶ 80    Inmates do not have a liberty interest in avoiding transfer to discretionary (nondisciplinary) segregation, such as segregation imposed for administrative, protective, or investigative purposes. *Townsend v. Fuchs*, 522 F.3d 765, 771 (7th Cir. 2008). "[T]here is nothing 'atypical' about discretionary segregation." *Id.* However, a liberty interest may be implicated in regard to segregation if prison officials restrain the freedom of inmates in a manner that "imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin v. Conner*, 515 U.S. 472, 484 (1995); see also *Wilkinson v. Austin*, 545 U.S. 209, 224 (2005). Although prisoners do not have a constitutional right to remain in the general population, both the duration and conditions of the segregation must be considered to determine whether due process is implicated. *Isby*, 856 F.3d at 524; *Marion v. Columbia Correctional Institution*, 559 F.3d 693, 697-98 (7th Cir. 2009) ("a liberty interest may arise if the length of segregated confinement is substantial and the record reveals that the conditions of confinement are unusually harsh" (emphasis omitted)); see also *Bryan v. Duckworth*, 88 F.3d 431, 433 (7th Cir. 1996) (if the conditions of segregation are significantly harsher than those in the normal prison environment, then a year of segregation "might count as a deprivation of liberty where a few days or even weeks might not"), *abrogated on other grounds by Diaz v. Duckworth*, 143 F.3d 345, 346 (7th Cir. 1998). The due process clause mandates that prison officials periodically review an inmate's placement in administrative segregation and determine whether an inmate is a continued threat. *Isby*, 856 F.3d at 524-25 (inmates are entitled to an "informal and nonadversary" periodic review to prevent administrative segregation from becoming a pretext for indefinite confinement).

¶ 81    Here, Kucinsky alleged he was placed on administrative detention "indefinitely," and he was placed in the "north" administrative detention building on February 9, 2015, where he was subjected to certain harsh conditions—allegations that we accept as true for the purpose of reviewing the trial court's dismissal of his claim. He also alleged that on January 19, 2016, at an "administrative detention hearing,"[10] Kochel, acting as a committee member, stated that Kucinsky would be "released" from administration detention when he stopped filing grievances and civil suits against IDOC and stopped criticizing IDOC in his mail. These allegations do not sufficiently indicate, even when liberally construed, the duration of Kucinsky's administrative detention. It is not clear from the allegations whether Kucinsky was continuously in administrative detention or whether he was periodically placed in and out of administrative detention from time to time. Additionally, Kucinsky does not allege the specific dates he was in the "north" administrative detention building where he experienced the alleged harsh conditions.

¶ 82    Given Kucinsky's failure to allege how long he remained in administrative segregation and, more specifically, failure to allege for how long he was placed in the "north" administrative detention building experiencing the alleged harsh conditions of confinement, Kucinsky failed to sufficiently allege that he was deprived a liberty interest. See *Hardaway v. Meyerhoff*, 734 F.3d 740, 743 (7th Cir. 2013) (although relatively short terms of segregation rarely give rise to a prisoner's liberty interest, such a liberty interest may arise from a long term of confinement combined with atypical and significant hardships). Kucinsky also failed to allege any facts to support his claims that the hearing notice was vague and that he was subjected to a sham hearing.

---

[10]This is the same date that Kucinsky's new disciplinary hearing took place.

29

We, therefore, affirm the trial court's dismissal of Kucinsky's due process claim related to his placement, or continued placement, in administrative detention.

¶ 83                                    b. Mail Interference

¶ 84        Kucinsky also argues that he sufficiently alleged that defendants Vilt, Kochel, and Starkey violated his right to due process, and IDOC's own rules, in relation to the handling of his mail.

¶ 85                                    i. Legal Mail

¶ 86        While the First Amendment generally governs a prisoner's right to send and receive mail, the fourteenth amendment is invoked where a plaintiff claims that the opening of his legal mail has affected his ability to defend or represent himself. See *Guajardo-Palma v. Martinson*, 622 F.3d 801, 802-04 (7th Cir. 2010) (claims involving interference with legal mail are analyzed under the fourteenth amendment's due process clause). Prison officials potentially violate an inmate's rights if they open a letter outside of the inmate's presence that is marked with an attorney's name and a warning that the letter is legal mail. *Kaufman v. McCaughtry*, 419 F.3d 678, 686 (7th Cir. 2005) (citing *Wolff v. McDonnell*, 418 U.S. 539, 577 (1974)). A prisoner alleging a due process claim of interference with legal mail must show there was a resulting hinderance of a nonfrivolous legal claim. *Guajardo-Palma*, 622 F.3d at 805-06 (interference with a prisoner's confidential communications with his lawyer is subject to a harmless-error analysis). Proof of a practice of reading a prisoner's correspondence with his lawyer should be sufficient to demonstrate such hindrance. See *id.* at 805 (a prisoner's attorney's knowledge, by way of inference resulting from a policy or practice that prison officials are likely to read his communications with his client outside his client's presence, leads to a high probability of

reduced candor in those communications). However, isolated incidents of interference with legal mail are generally insufficient to maintain a claim. *Id.*

¶ 87     Here, Kucinsky does not allege that he was hindered in any way from pursuing a nonfrivolous legal claim. He also has not sufficiently alleged that there was a "a practice" of prison officials reading his correspondence between himself and his attorney. See *id.* Although he alleged that four pieces of incoming "legal" mail were opened outside of his presence, he failed to allege that any of the mailings, but one, were from his own attorney and failed to indicate that any of those mailings were sensitive in nature. See *id* at 804 (not all legal mailings are entitled to the same confidentiality considerations as those from a prisoner's attorneys; while some legal mailings are sensitive, most are from courts and agencies containing public information or are routine and nonsensitive). Therefore, Kucinsky failed to allege the hinderance of a nonfrivolous legal claim resulting from defendants' alleged actions. See *id.* at 806 ("as long as the prison confines itself to opening letters that either are public or if private still are not of a nature that would give the reader insights into the prisoner's legal strategy, the practice is harmless"); *Kaufman*, 419 F.3d at 686 (no constitutional violation occurred by opening inmate's correspondence that was not with an attorney representing him or an attorney from whom the inmate was seeking representation).

¶ 88                         ii. Notice for Censored Mail

¶ 89     Kucinsky also argues that he stated a due process claim because, pursuant to prison regulations, he was entitled to notice when any of his mail (either incoming or outgoing) was "rejected." Kucinsky contends that defendants failed to comply with certain prison regulations that require prison officials to provide notice to a prisoner if an incoming or outgoing letter was "rejected." However, prison regulations "were never intended to confer rights on inmates or

31

serve as a basis for constitutional claims." (Emphasis omitted.) *Ashley v. Snyder*, 316 Ill. App. 3d 1252, 1258 (2000). Rather, prison regulations "were designed to provide guidance to prison officials in the administration of prisons." *Id.* Kucinsky did not have a liberty interest in being provided with notice regarding his "rejected" mail, and therefore, he failed to state a due process claim in this regard.

¶ 90                                    c. Access to the Courts

¶ 91        Kucinsky additionally argues that he stated a due process claim for the denial of access to the courts. Kucinsky alleged that on January 19, 2014, after a search of his cell, some of his "legal work" was confiscated without justification. He also alleged that on November 9, 2014, over 200 pages of trial transcripts pertaining to his criminal case, legal books, and grievances were confiscated after a shakedown of his cell. In order to state an access to courts claim, a plaintiff must connect defendant's conduct with his "inability to pursue a legitimate challenge to a conviction, sentence, or prison conditions." (Internal quotation marks omitted.) *Ortiz v. Downey*, 561 F.3d 664, 671 (7th Cir. 2009). Kucinsky failed to assert any such allegations.

¶ 92        We, therefore, conclude that Kucinsky's due process claims were properly dismissed.

¶ 93                                    3. Eighth Amendment

¶ 94        Kucinsky additionally argues that he alleged sufficient facts to state a claim under the eighth amendment of the United States Constitution (U.S. Const., amend. VIII). Defendants argue he failed to do so.

¶ 95        The conditions under which an inmate is confined and the treatment he receives in prison are subject to the eighth amendment's proscriptions against cruel and unusual punishment. *Farmer*, 511 U.S. at 832. Although the United States Constitution does not mandate comfortable prisons, it does not permit inhumane prisons. *Id.* The eighth amendment places a duty on prison

32

officials to ensure humane prison conditions. *Id.* Prison officials must ensure that inmates receive adequate food, clothing, shelter, and medical care and take reasonable measures to guarantee the safety of the inmates. *Id.*; *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981) (prisoners must be provided with "the minimal civilized measure of life's necessities"). This includes providing inmates with reasonably adequate ventilation, sanitation, bedding, hygienic materials, and utilities. *Hardeman v. Curran*, 933 F.3d 816, 820 (7th Cir. 2019).

¶ 96        Inhumane conditions alone do not constitute an eighth amendment violation. See *Wilson v. Seiter*, 501 U.S. 294, 304-05 (1991). Prisoners challenging the conditions of their confinement must also show that officials acted deliberately indifferent to an excessive risk to the inmate's health or safety. See *Farmer*, 511 U.S. at 837 ("a prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety"). Two elements are required to establish a violation of the eighth amendment's prohibition against cruel and unusual punishment: (1) an objective showing that the alleged deprivations were "sufficiently serious" in that the conditions denied the inmate "the minimal civilized measure of life's necessities," creating an excessive risk to the inmate's health or safety and (2) a subjective showing of a defendant's culpable state of mind of deliberate indifference to the risk. (Internal quotation marks omitted.) *Id.* at 834.

¶ 97        In this case, Kucinsky alleged that he was placed in a tiny (two steps by three steps), "filthy" cell that had previously been maced but not cleaned and had no access to natural light. He was confined to the cell for "almost" 24-hours per day, with "limited" noncontact visits and "limited" access to recreation yards with "unmeaningful" recreation activities. He was given "small meal" portions in his cell, exposed to 24-hour lighting, "constant banging" on the doors in

33

his unit, mice infestation, and extreme temperatures. He also alleged that mace was "regularly" sprayed in the unit, causing him to choke and struggle to breathe and causing his eyes to burn, and that he lacked cleaning supplies.

¶ 98        Kucinsky has failed to allege facts indicating a sufficient serious deprivation to support his claim under the eighth amendment because he does not indicate the severity, duration, nature of the risk, or his susceptibility to the alleged prison conditions (other than alleging he has a "mental condition"). See *Thomas v. Illinois*, 697 F.3d 612, 614-15 (7th Cir. 2012) (depending on the severity, duration, nature of the risk of involved, and the inmate's susceptibility, prison conditions may violate the eighth amendment). We again note Kucinsky alleged that he was exposed to these certain conditions of confinement while in the "north" administrative detention building but does not indicate the duration of time he was incarcerated in that location.

¶ 99        Additionally, Kucinsky failed to describe the alleged unsanitary conditions or the length of time he lacked cleaning supplies. See *Lunsford v. Bennett*, 17 F.3d 1574, 1580 (7th Cir. 1994) (holding a temporary denial of cleaning supplies did not violate the eighth amendment when the record lacked evidence the prison cells were "unusually dirty or unhealthy, or that health hazards existed"). As for the mice "infestation," Kucinsky does not describe the extent or frequency of the "infestation" or how the pests affected him. See *Smith v. Dart*, 803 F.3d 304, 312-13 (7th Cir. 2015) (inmate's infestation allegations were insufficient where he failed to indicate the extent of the infestation or how he was affected by the infestation). Also, other than stating mace was sprayed "regularly" in the unit, Kucinsky does not specify the frequency of the sprayings or how often he experienced physical distress from mace exposure or the duration of that physical distress. Further, although Kucinsky alleged he was given "small" meals, he in no way indicated these meals were insufficient. See *French v. Owens*, 777 F.2d 1250, 1255 (7th Cir. 1985) (the

34

United States Constitution mandates that prison officials provide inmates with "nutritionally adequate food that is prepared and served under conditions which do not present an immediate danger to the health and well being of the inmates who consume it" (internal quotation marks omitted)). As for his claim of a lack of exercise, Kucinsky does not indicate that his movement was restricted to the point that his health was threatened in any way. See *Antonelli v. Sheahan*, 81 F.3d 1422, 1432 (7th Cir. 1996) (lack of exercise rises to a constitutional violation in extreme and prolonged situations where an inmate's movement is denied to the point his health is threatened). As for his vague allegations of a lack of natural lighting, "constant" banging on cell doors, "24-hour lighting," and extreme temperatures due to poor ventilation, Kucinsky does not assert sufficient facts to indicate that these conditions, either when considered individually or in combination with other conditions, were "sufficiently serious" to state a claim for cruel and unusual punishment under the eighth amendment. See *Isby*, 856 F.3d at 521-23 (without an egregious deprivation, an inmate's complaints about the conditions of his confinement fall short); see also *Vasquez v. Frank*, 290 F. App'x 927, 929 (7th Cir. 2008) (24-hour lighting involving a single, 9-watt fluorescent bulb does not objectively constitute an "extreme deprivation"). Kucinsky has failed to sufficiently allege a "sufficiently serious" deprivation and, thus, failed to allege an eighth amendment claim based on the conditions of his confinement.

¶ 100        Additionally, as for his eighth amendment claim specifically against Pfister, Kucinsky alleged that Pfister was "aware," through a certain study, that forms of isolation, such as administrative segregation, causes pain, suffering, mental deterioration, and physical injury, "especially on someone like plaintiff with mental illness." Kucinsky failed to allege the duration of his segregated confinement and failed to allege the affect the isolation had or potentially could have on him. "[A]greement among mental health professionals regarding the deleterious effects

35

of solitary confinement does not translate into legal notice that defendants may have been violating the Eighth Amendment." *Freeman v. Berge*, 283 F. Supp. 2d 1009, 1016-17 (W.D. Wis. 2003); see also *Isby*, 856 F.3d at 524 (concluding that while the court, as a personal matter, found the length of plaintiff's segregated confinement "greatly disturbing," under current law plaintiff failed to allege an eighth amendment violation).

¶ 101    Therefore, we conclude that the trial court properly dismissed Kucinsky's eighth amendment claim.

¶ 102                                    4. Prayer for Relief

¶ 103    The parties and the trial court did not address any issues related to the plaintiff's prayer for relief, wherein he requested $20,000 in compensatory damages, $20,000 in punitive damages, and any other relief the court deemed just and proper in the interest of justice. We, therefore, make no ruling related to the requests for relief or whether Kucinsky's prayer for relief encompassed a request for nominal damages. See generally *Calhoun v. DeTella*, 319 F.3d 936, 942-43 (7th Cir. 2003) (at a minimum, a plaintiff who proves a constitutional violation is entitled to nominal damages; nothing prevents an award of punitive damages for constitutional violations when compensatory damages are not available; even though the *pro se* plaintiff did not expressly request nominal damages in his prayer for relief, liberally construing the *pro se* pleading, his request for " 'such other relief as it may appear plaintiff is entitled' " could be viewed as a request for nominal damages).

¶ 104                                    CONCLUSION

¶ 105    The judgment of the circuit court of Will County is affirmed in part and reversed in part, and this cause is remanded for further proceedings.

¶ 106    Affirmed in part and reversed in part; cause remanded.

**No. 3-17-0719**

| | |
|---|---|
| **Cite as:** | *Kucinsky v. Pfister*, 2020 IL App (3d) 170719 |
| **Decision Under Review:** | Appeal from the Circuit Court of Will County, No. 16-MR-3156; the Hon. Arkadiusz Z. Smigielski, Judge, presiding. |
| **Attorneys for Appellant:** | Charles Kucinsky, of Sumner, appellant *pro se*. |
| **Attorneys for Appellee:** | Kwame Raoul, Attorney General, of Chicago (David L. Franklin, Solicitor General, and Kaitlyn N. Chenevert, Assistant Attorney General, of counsel), for appellees. |